The STATE of Texas,

v.

Steven Mack HARDY, Appellee.

No. 1061–94.

Court of Criminal Appeals of Texas, En Banc.

Nov. 19, 1997.

Opinion Dissenting from Denial of Rehearing Jan. 14, 1998.

Brian Wice, Ross Palmie, Houston, for appellant.

Carol M. Cameron, Asst. Dist. Atty., Houston, Matthew Paul, State's Atty., Austin, for State.

*OPINION ON APPELLEE'S PETITION FOR DISCRETIONARY REVIEW*

KELLER, Judge, delivered the opinion of the Court, in which McCORMICK, Presiding Judge, and MANSFIELD, HOLLAND and WOMACK, Judges, joined.

Appellee was charged with the misdemeanor offense of driving while intoxicated. Before trial, he filed a motion to suppress medical records containing blood-test results. The trial court granted the motion to suppress but its decision was subsequently reversed by the Court of Appeals. We granted review to determine whether the Court of Appeals erred in holding that appellee possessed no privilege or reasonable expectation of privacy in his medical records. We will affirm.

### 1. Facts

Appellee was involved in an automobile accident on December 3, 1992. Trooper Authier of the Department of Public Safety investigated the scene and formed the opinion that appellee was intoxicated.[1] Due to

---

1. Although the trial court sustained objections to questions concerning whether Trooper Authier had probable cause to believe appellee was intoxicated, Trooper Authier testified without objection, under cross-examination, that his opinion was "more than a suspicion" and was based upon physical evidence and things that he observed. Trooper Authier's testimony indicates

his injuries, appellee was subsequently "life-flighted" to a local hospital. During the course of treatment, the hospital drew blood from appellee and conducted a blood alcohol test for medical purposes.[2] On December 7, Trooper Authier obtained a grand jury subpoena for alcohol or drug information pertaining to appellee's treatment. The records obtained reflected that appellee's blood alcohol content was .239. Ten days later, appellee was charged with misdemeanor driving while intoxicated.

Before trial, appellee filed a motion to suppress the blood test results and other medical record evidence on the basis that the records were obtained in violation of the physician-patient-privilege under the Texas Medical Practice Act, Tex.Rev.Civ. Stat. Article 4495b, § 5.08. The trial court granted appellee's motion and found that Trooper Authier's "actions violated the Texas Medical Practice Act, as well as the defendant's right to a reasonable expectation of privacy."[3] The State appealed and the Court of Appeals reversed and remanded. The Court of Appeals held that the trial court erred in granting the motion to suppress because § 5.08 of the Texas Medical Practice Act had been repealed by Tex.R.Crim. Evid. 509. The Court of Appeals further held that the repeal of § 5.08 extinguished any reasonable expectation of privacy in medical records in criminal cases.

In his petition for discretionary review, appellee argues that the Emergency Medical Services Act, Texas Health & Safety Code, Chapter 773 is a legislative response to our repeal of § 5.08 and restored any reasonable expectation of privacy abrogated by the adoption of Rule 509. Appellee alleges the new act gives him the same statutory right of privacy that § 5.08 gave the defendant in State v. Comeaux, 818 S.W.2d 46 (Tex.Cr. App.1991). Appellee also argues, based upon Comeaux, that a Fourth Amendment constitutional right to privacy in medical records

exists regardless of the status of the physician-patient privilege in Texas.

## 2. Prior cases

In Comeaux, the defendant was involved in a car accident. Id. at 48. The DPS trooper at the scene did not believe that the defendant was intoxicated. Id. The defendant was subsequently taken to a hospital, where a sample of his blood was drawn for medical purposes in accordance with the order of an attending physician. Id. at 48–49. The tests performed upon the defendant's blood did not include a blood alcohol content analysis. Id. at 49. A police officer subsequently used a false authorization form to acquire a portion of the blood sample, and a blood alcohol test was conducted by law enforcement agents. Id. at 48–49.

A four-judge plurality opinion held that the State's acquisition of the blood sample violated the Fourth Amendment and the Texas constitutional counterpart. Id. at 53. Relying heavily upon § 5.08 of the Medical Practice Act, the plurality reasoned that the defendant had a legitimate expectation of privacy in his blood sample. Id. at 52–53. In its discussion, however, the plurality also indicated that an expectation of privacy in blood testing is a part of understandings recognized and permitted by society. Id. at 52 (citing HIV and drug use testing). In a concurring opinion, Judge Campbell, joined by Judge Benavides, maintained that the State's acquisition of the blood sample violated the privilege set out in § 5.08 because no criminal prosecution was pending at the time the defendant's blood was transferred to law enforcement authorities. Id. at 56 (Campbell, J. concurring). Judge Campbell specifically repudiated the plurality's expectation of privacy rationale as "likely incorrect." Id. at 54 (Campbell, J. concurring). Two other judges concurred without opinion, and one judge dissented. Id. at 53 & 56.

that he could have arrested appellee and filed charges based solely upon his observations if appellee had not required medical attention.

**2.** In its findings of fact and conclusions of law, the trial court found that blood was not taken

from appellee in response to a request from Authier or any governmental agency.

**3.** In its findings, the trial court found Trooper Authier to be a credible witness and accepted his testimony as true.

■ Because *Comeaux* is only a plurality opinion, it is not binding precedent. In a subsequent opinion, we did cite *Comeaux* with approval for the proposition that there is a reasonable expectation of privacy in physician-patient communications. *Richardson v. State*, 865 S.W.2d 944, 952–953 & 953 n. 7 (Tex.Crim.App.1993). This comment, however, was mere *dicta* because the question in the case was whether a pen register constituted a search under Article I, § 9 of the Texas Constitution. *See Richardson*, generally. Moreover, the existence of a reasonable expectation of privacy in physician-patient communications, generally, does not necessarily mean that medical records would carry an expectation of privacy in every situation. Nevertheless, while *Comeaux* and *Richardson* are not binding, we may look to those opinions for their persuasive value. With that consideration in mind, we address the privilege and constitutional issues.

### 3. Physician/patient privilege

Tex.R.Crim. Evid. 509 states: "There is no physician-patient privilege in criminal proceedings." Rule 509 applies to proceedings before a grand jury. Tex.R.Crim. Evid. 1101(b). *See also* Tex. Atty. Gen. Op. JM–1075 at 3811. This Court, by order dated December 18, 1985, repealed § 5.08 [4] insofar as it relates to criminal law matters. *See* Rev. Civ. Stat. Ann., Article 4495b, Repeal commentary (Vernon's Supp.1997). The Texas Constitution empowers the Legislature to delegate rule-making authority to this Court, and accordingly, the Legislature delegated to this Court the power to promulgate rules of evidence and to repeal a number of evidentiary statutes, including § 5.08. *See* Tex. Const., Art. 5, § 31; Tex.Rev.Civ. Stat. Ann., Art. 1811f, §§ 5, 6, & 9 (Vernon's Supp. 1986). On the face of the rules and statutes, it appears that any physician-patient privilege that might have existed under § 5.08

has been abrogated by the repeal of § 5.08 and the promulgation of Rule 509.

However, in some cases construing the rules of *appellate procedure*, we have indicated that this Court may not "abridge, enlarge, or modify" a litigant's substantive rights when we repeal a statutory provision and replace it with a rule. *Davis v. State*, 870 S.W.2d 43, 45–46 (Tex.Crim.App.1994)(This Court may not, through appellate rule, enlarge appellate jurisdiction provided by former statute—nonjurisdictional defects occurring after the plea); *Lyon v. State*, 872 S.W.2d 732, 734–736 (Tex.Crim.App. 1994)(same); *Flowers v. State*, 935 S.W.2d 131, 132–134 (Tex.Crim.App.1996)(This Court may not, through appellate rule, restrict appellate jurisdiction recognized under former statute—claim that plea was involuntary). These cases relied upon statutory language in former Article 1811f, § 1 (Vernon's Supp. 1986)—now Tex. Gov't Code § 22.108(a). The section of the delegating statute relating to evidence contains a similar—though not identical—provision. *See* Article 1811f, § 5 (Vernon's Supp.1986). To determine whether the rationale in *Davis, Lyon*, and *Flowers*, applies to the instant case, we engage in statutory construction to determine the meaning of the provision relating to evidence.

■ The starting point in an analysis of the meaning of a statute is, of course, the language of the statute itself. When the language of the statute is unambiguous, we must give effect to the plain meaning of the words unless doing so would lead to absurd results. *Boykin v. State*, 818 S.W.2d 782, 785–786 & 786 n. 4 (Tex.Crim.App.1991). When the language of a statute is ambiguous, we may look to extratextual factors for guidance in determining the statute's meaning. *Id.* Following these principles, we find the rationale in *Davis, Lyon*, and *Flowers* to be inapplicable to the present case for two reasons.

---

4. § 5.08(g)(8) provides an exception to confidentiality requirements in criminal matters. An exception to confidentiality exists:

in any criminal prosecution where the patient is a victim, witness, or defendant. Records are not discoverable until the court in which the prosecution is pending makes an in camera determination as to the relevancy of the records or communications or any portion thereof. Such determination shall not constitute a determination as to the admissibility of such records or communications or any portion thereof.

First, we hold that the legislatively conferred power to repeal statutes relating to evidence differed from the legislatively conferred power to repeal statutes relating to appellate procedure: the Legislature conferred absolute authority to repeal specified statutes relating to evidence but gave only limited authority to repeal specified statutes relating to appellate procedure. This conclusion flows naturally from differences in the plain language of the statutory provisions relating to appellate procedure and evidence. The appellate procedure provision that prevents appellate rules from abridging, enlarging or modifying substantive rights contains a reference to a provision that permits the repeal of certain specified statutes relating to appellate procedure:

> *Articles of the Code of Criminal Procedure, 1965, that govern posttrial appellate and review procedure in criminal cases are hereby repealed pursuant to Section 4 of this Act.* The court of criminal appeals is granted rulemaking power to promulgate rules of posttrial, appellate, and review procedure in criminal cases except that its rules may not abridge, enlarge, or modify the substantive rights of a litigant.

Article 1811f, § 1 (Vernon's Supp.1986)(emphasis added). Specific statutes are designated for repeal in § 4(b). But the counterpart provision for evidence contains no reference to its repealer section:

> The court of criminal appeals has the full rulemaking power in the promulgation of rules of evidence in the trials of criminal cases, except that its rules may not abridge, enlarge, or modify the substantive rights of a litigant.

Article 1811f, § 5 (Vernon's Supp.1986). Instead, the evidence repealer section simply stands on its own and lists a number of specific statutes that may be designated for repeal. *See* Article 1811f, § 9.

We generally presume that every word in a statute has been used for a purpose and that each word, phrase, clause, and sentence should be given effect if reasonably possible. *Morter v. State,* 551 S.W.2d 715, 718 (Tex.Crim.App.1977), *quoting Eddins-*

*Walcher Butane Co. v. Calvert,* 156 Tex. 587, 591, 298 S.W.2d 93, 96 (1957). The appellate procedure and evidence sections of the statute were both drafted by the Senate–House Select Committee on the Judiciary, and they were contained in two consecutively numbered bills that were later combined into a single bill passed into law by the Legislature.[5] We must presume, therefore, that the Legislature intended to add meaning to the statute by placing a repealer reference in the "substantive rights" section of the appellate procedure provisions and by failing to place such a reference in the counterpart section of the evidence provisions. The logical conclusion is that the legislature intended to confer absolute authority to repeal specified provisions relating to evidence but intended to confer only limited authority to repeal specified provisions relating to appellate procedure.

This interpretation of the language of former Article 1811f is buttressed by the Legislature's subsequent reenactment of the statute through codification. The legislature repealed all of the provisions in Article 1811f relating to appellate procedure, but recodified only some of those provisions in Tex. Gov't Code § 22.108. Noticeably absent from that government code section is the repealer provision relating to appellate procedure. *See* § 22.108. However, the Legislature did not repeal from Article 1811f the repealer provision relating to evidence although it did repeal all other sections relating to evidence and moved them to Tex. Gov't Code § 22.109. By maintaining the evidence repealer section in a separate statute, the Legislature has indicated that the section was indeed intended to be a stand-alone provision, granting absolute authority to repeal the statutes specified therein.

Moreover, the legislative history, while ambiguous, is at least consistent with our interpretation. Professor Guy Wellborn, a resource witness for the bill, testified that most of the repealed statutes would be replaced by rules of evidence that were "identical in effect," but some rules would be inconsistent

---

5. The bill is reported as H.B. 13, but the original text of that bill was struck by amendment on the Senate floor on May 26, 1985 and replaced with the language contained in S.B. 354 and S.B. 355.

with the repealed statutes they replaced. Public Hearing, Senate Criminal Justice Committee, S.B. 355, March, 3, 1985. Senator Glasgow, the Senate sponsor of the bill, noted that certain sacred areas of the law, such as confessions and search and seizure, would not be touched by the legislation. Id. There are, of course, no references to those provisions in the repealer section. Further, Representative Toomey, the House sponsor of the bill, recognized the ability of the Legislature to override a rule the Legislature did not want or to rescind the repeal of a particular statute the legislature did not wish repealed. Public Hearing, House Criminal Jurisprudence Committee, S.B. 355, April 29, 1985. This comment shows a recognition that this Court could, through statutory repeal and rule promulgation, produce an evidentiary practice at variance with the repealed legislation. That the legislature might want to override such a variance may be some indication that the Legislature anticipated that this Court would take some actions that change the substantive rights of litigants rather than merely affecting matters of procedure.

Further, in their final report, the Select Committee on the Judiciary recommended granting this Court rule-making powers "so that the rules may be judicially promulgated *and that* statutory provisions *in conflict with* the code [of rules of evidence] may be repealed" (emphasis added; bracketed material inserted). Final Report, Senate–House Select Committee on the Judiciary: Recommendations to the 69th Legislature, January 1985, p. 75. With their report, the Committee submitted an "attached code" to this Court "as being worthy of promulgation." Id. Although our research has failed to uncover a copy of a proposed draft of the Rules of Criminal Evidence designated as the "attached code," we have discovered in the committee materials a draft of the rules marked as the "final draft," dated November 7, 1984. In that draft, proposed rule 510, concerning the physician-patient privilege, is identical to Rule 509 as currently written. *See* Draft,

Criminal Rules of Evidence, November 7, 1984, p. 16 (on microfilm). In the repealer section of the statute relating to evidence, § 5.08 was specifically mentioned as one of the statutes designated for repeal. To the extent that Rule 509 may be interpreted as modifying substantive rights created by the Medical Practice Act, one can logically infer from the committee report, the committee's proposed draft of the rules, and the statute that the Legislature intended to abrogate any privilege contained in § 5.08.[6]

However, even if we assumed that the legislature intended to prevent changing the substantive rights of litigants, the rationale in *Davis, Lyon,* and *Flowers* would be inapplicable for a second reason: the change in practice presented by the case at bar involves matters of procedure rather than substantive rights.. The Medical Practices Act created a physician-client privilege but excepted criminal cases from that privilege. *See* § 5.08(g)(8). There are three textual differences between the criminal exception to the privilege in § 5.08 and Rule 509:(1) the § 5.08 exception applied to criminal "prosecutions" while Rule 509 applies to criminal "proceedings," (2) the § 5.08 exception applied only to instances in which the patient is a victim, witness, or defendant while Rule 509 contains no such apparent limitation, and (3) § 5.08 contained an in camera inspection requirement before records were discoverable while Rule 509 contains no such requirement. *Compare* § 5.08(g)(8) and Rule 509. Whether these differences in language implicate substantive rights is uncertain from a mere reading of the text of the statute. Grand jury proceedings might be considered part of a "criminal prosecution." The limitation to victims, witnesses, and defendants may cover the entire field of medical records relevant to criminal proceedings. And, the in camera inspection requirement may simply be a procedural mechanism designed to retain confidentiality in records that are not truly implicated by the criminal cases exception to the privilege.

---

**6.** The Committee Report was submitted to the Governor, Lieutenant Governor, Speaker, and the entire Legislature; so, the lawmaking branches of the government were at least on notice concerning the Committee's Report and draft of the rules of evidence. *See* Final Report, letter from Ray Farabee and Bob Bush.

The Select Committee originally considered the idea of drafting a single, integrated set of rules of evidence, governing both civil and criminal cases. The February 15, 1984 integrated rules draft of the physician-patient privilege contained an exception "in any criminal investigation or proceeding." Proposed Rule 510(d)(6). On February 23, 1984, the Committee also produced a criminal-only draft of the rules, which made no mention of a physician-patient privilege. On April 25, 1984, the integrated rules draft was revised to provide an exception "in any criminal prosecution where the patient is a victim, witness, or defendant." Next to the revision is the notation "Wellborn 4–7–84." There was an additional notation stating "Repeal Art. 4495, V.A.T.S., appropriate section?" Then, in October, the Committee decided to abandon the integrated rules approach in favor of a set of rules solely for criminal cases. The Select Committee decided to revise again the language of the physician-patient privilege rule as it related to criminal matters, altering the rule to its present form. The Committee members concluded that the Legislature had intended to completely abrogate the physician-patient privilege in criminal cases:

UNKNOWN COMMITTEE MEMBER: And it says in any criminal prosecution where the patient was a victim, witness, or defendant. And that pretty well obliterates the physician-patient privilege. Although if I let my imagination run wild I suspect I could come up with a situation where the medical records of someone who is neither a victim, witness, nor a defendant might be relevant in a criminal prosecution. My guess is the legislature did not intend to do anything but obliterate physician patient privilege when they added that language but it's not clear to me.

. . . .

UNKNOWN COMMITTEE MEMBER: The only issue that we have to address here is whether this language "in any criminal prosecution where the patient is a victim witness, or defendant" was intended by the legislature to be a blanket exception to the physician-patient privilege. If it is, there's no physician-patient-privilege in criminal proceedings and we can just go with the language there is no physician-patient privilege. My thinking was that the chances of a physician-patient problem coming up in a context where the patient was neither a victim, witness, or defendant was so remote that, in fact a blanket exception had been created. We'd just need to say there is no physician-patient privilege.

. . . .

PROFESSOR WELLBORN: This is clearly what the legislature intended by that exception. There's no question that when they say the privilege doesn't apply when the patient is a victim, witness, or defendant that what they meant to say is that the privilege doesn't apply in a criminal case. I don't think there is any doubt about that. So that would, the motion is to effectuate in the most straightforward way what the legislature's already done. [Vote to change the rule from "victim, witness, or defendant" language to current language carried eight to two].

Hearing, Senate–House Select Committee on the Judiciary, Subcommittee on Criminal Matters, October 15, 1984, Tape 3, transcript at 28–31 (on microfilm).

While the "prosecution" and the "victim, witness, or defendant" language was deleted from Rule 509 approximately one month before the final draft, the in camera inspection requirement was absent from even the earlier drafts of the rules. The absence of the in camera inspection requirement from the earlier and final drafts indicates that the requirement was never seriously considered to be a substantive right worthy of protection. Moreover, to the extent that the in camera inspection requirement may have served confidentiality purposes by preventing the disclosure of irrelevant information, there is nothing to prevent a litigant or an interested third party from requesting and obtaining an in camera hearing through a motion to quash a subpoena, a motion for protective order, or a motion for an in camera hearing on the admissibility of the evidence. *See Coleman v. State*, No. 491–96, slip op. at 4–5, —— S.W.2d ——, —— ——, 1997 WL 209530 (Tex.Crim.App., delivered April 30, 1997); *Ex Parte Scarbrough*, 604 S.W.2d 170 (Tex.

Crim.App.1980); *Moreno v. State*, 858 S.W.2d 453, 465 (Tex.Crim.App.1993).

█ Finally, our conclusion that the Legislature intended to give effect to Rule 509 as written, whether it did so because a change in substantive rights was authorized or because the changes made were merely procedural, is supported by the Legislature's continued inaction in this arena. "When the Legislature meets, after a particular statute has been judicially construed, without changing that statute, we presume the Legislature intended the same construction should continue to be applied to that statute." *Marin v. State*, 891 S.W.2d 267, 271–272 (Tex.Crim. App.1994). We believe that the same reasoning applies when the judicial construction at issue takes the form of a judicially-promulgated rule instead of a judicial decision. As noted above, during the committee hearings, the Legislature itself recognized its power to disapprove of this Court's Rules of Evidence. The Legislature has had numerous opportunities to overturn Rule 509 if it wished, but it has refrained from doing so.

█ Appellee contends, however, that the Legislature did overturn Rule 509 by enacting Texas Health & Safety Code § 773.092(c) & (d). But, Chapter 773 does not apply to physicians, nurses, or other health care practitioners unless they "staff[ ] an emergency medical services vehicle regularly." § 773.004(a)(5).[7] Such a limited enactment cannot be construed as an intention to overturn Rule 509's applicability to physician-patient relationships in general. Moreover, Chapter 773 expressly refers to both the criminal and civil privilege rules but conspicuously omits any reference to Criminal Rule 509:

> Notwithstanding *Rule 501*, Texas rules of Criminal Evidence, and Rule 501, Texas Rules of Civil Evidence, the privilege of confidentiality may be claimed in any criminal, civil, or administrative proceeding. . . .

§ 773.091(e)(emphasis added). Criminal and Civil Rules 501 both state that no privilege exists unless provided by constitution, statute, or rule. *See* Tex.R.Crim. Evid. 501 & Tex.R. Civ. Evid. 501. But, Rule 509 expressly abrogates the physician-patient privilege. If the Legislature had intended to overturn Rule 509, it could have mentioned the rule in its legislation. We cannot agree with appellee that the Legislature expressed an intent to overturn Rule 509 by enacting Chapter 773. Having found that no privilege applies, we turn next to the Fourth Amendment issue.

### 4. Fourth Amendment

█ While an appellate court must view the historical facts in the light most favorable to the trial court's determination, whether those facts, once determined, give rise to a reasonable expectation of privacy is a question of law to be reviewed *de novo*. *Villarreal v. State*, 935 S.W.2d 134, 138 n. 5 (Tex. Crim.App.1996); *Id.* at 145 & 149 (Keller, J. concurring). In determining whether an expectation of privacy is viewed as reasonable by "society," the proper focus, under the Fourth Amendment, is upon American society as a whole, rather than a particular state or other geographic subdivision. *Villarreal,* 935 S.W.2d at 139; *Id.* at 149 n. 2 (Keller, J. concurring)(citing *California v. Greenwood,* 486 U.S. 35, 43–44, 108 S.Ct. 1625, 1630–31, 100 L.Ed.2d 30 (1988)).

█ There is no question that the drawing of blood from a person's body infringes an expectation of privacy recognized by society as reasonable. *Skinner v. Railway Labor Exec. Assn.,* 489 U.S. 602, 616, 109 S.Ct. 1402, 1412–13, 103 L.Ed.2d 639 (1989). Where the drawing of blood is instigated by the government, a subsequent analysis of the blood by government agents also constitutes an invasion of a societally recognized expectation of privacy. *Id.* However, the present case does not involve the drawing or analysis of blood by government

7. Appellee never raised his argument based upon Texas Health & Safety Code, Chapter 773 before the trial court or the Court of Appeals. And, while the record does not exclude the possibility that the blood test was conducted by emergency medical services personnel, there is no affirmative indication in the record that such was the case. Hence, we decline to address whether Chapter 773 applies to the present case but will discuss that statute insofar as it bears upon the applicability of § 5.08 and Fourth Amendment expectations of privacy.

agents. The blood was drawn and analyzed, and a written report was made, by the hospital for medical purposes. The question here is whether the government's acquisition of the written report infringed upon a societally-recognized expectation of privacy.[8] The Supreme Court has never decided a case involving this precise fact pattern.

The Supreme Court has on one occasion addressed society's expectations with regard to records held by a third party. In *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), the Court held that a depositor possessed no reasonable expectation of privacy in bank records relating to his account. *Id.* at 440–443, 96 S.Ct. at 1622–1624. In support of its holding, the Supreme Court explained that a depositor voluntarily exposes his financial information to the banking institution and assumes the risk that those records will be conveyed to the government. *Id.* at 442–443, 96 S.Ct. at 1623–1624. Like the bank, the hospital is a third party entrusted with personal information. But, release of medical information to hospitals is less optional than the release of financial information to banks. A person can choose not to maintain a bank account, but it hardly seems reasonable to expect someone to forego medical attention.

We note that five Texas appellate courts have addressed, in published opinions, whether, after the promulgation of Rule 509, a reasonable expectation of privacy exists in medical records containing blood test results where the records were made for medical purposes but were later subpoenaed by a grand jury. Four out of five held that society does not recognize as reasonable an expectation of privacy in those kinds of records. *Thurman v. State*, 861 S.W.2d 96 (Tex. App.—Houston [1st Dist.] 1993); *Corpus v. State*, 931 S.W.2d 30 (Tex.App.—Austin 1996); *Clark v. State*, 933 S.W.2d 332 (Tex. App.—Corpus Christi 1996); *Knapp v. State*, 942 S.W.2d 176 (Tex.App.—Beaumont 1997). *But see State v. Conrad*, CR–T1–97–23–133, slip op. (Tex.App.—Houston [14th Dist.], de-livered May 22, 1997)(holding that society recognizes a reasonable expectation of privacy). The main rationale articulated by these courts for finding no reasonable expectation of privacy is that the Court of Criminal Appeals made a "policy choice" in criminal cases by promulgating rule 509. *Thurman*, 861 S.W.2d at 100. *See Corpus*, 931 S.W.2d at 32 (relying upon *Thurman* ); *Clark* 933 S.W.2d at 333 (relying upon *Thurman* ); *Knapp*, 942 S.W.2d at 179 (relying upon *Thurman* ).

However, because Fourth Amendment expectations are those of *American* society, this Court cannot unilaterally make a policy choice on the matter. Moreover, the absence or inapplicability of a privilege does not foreclose the existence of a societally recognized expectation of privacy. A privilege stands as an absolute bar to the disclosure of evidence (absent an exception) while the Fourth Amendment merely imposes certain reasonableness requirements as a condition for obtaining the evidence. That medical records have not been given the absolute protection of a privilege does not mean they might not possess the qualified protections embodied by the Fourth Amendment.

Nevertheless, whether a privilege exists may be some evidence of societal expectations. *Comeaux*, 818 S.W.2d at 52 n. 7. But, although no privilege exists in criminal cases, a privilege does exist in civil cases and outside the litigation context. *See* Tex.R. Civ. Evid. 509; Article 4495b, § 5.08; Tex. Health & Safety Code § 773.091. These privileges are, however, riddled with exceptions. *See* Civil Rule 509(d); § 5.08(g) & (h); Health & Safety Code § 773.092. And, the court of appeals' opinions on the subject are also some evidence of society's expectations. But to fairly evaluate society's expectations, we must step beyond our state and take a nationwide perspective.

The physician-patient privilege did not exist at common law but is purely a statutory innovation. 2 Weinstein's Evidence ¶ 504[01], 504–9. The drafters of the Federal

---

8. The trial court and Court of Appeals indicate that there are "other" medical records that the trial court suppressed. But, appellant does not indicate the nature of those "other" medical records. Without knowing the contents of those records, we at this time decline to consider whether society would recognize an expectation of privacy in them. We limit the scope of our Fourth Amendment holding to the blood test results.

Rules of Evidence dropped the physician-patient privilege from their proposed list, but most states protect the privilege in some form. Goode, Wellborn, & Sharlot, *Guide to the Texas Rules of Evidence: Civil and Criminal,* 2nd ed., Vol. 1, § 509.1, 420–421 (1993); 2 Weinstein's Evidence ¶ 504[01], 504–9. However, the privilege is typically subject to numerous exceptions, which significantly reduce its scope and effectiveness. 2 Weinstein's Evidence ¶ 504[01], 504–10. And the privilege has generally been regarded by legal scholars with scorn and condemnation. 2 Weinstein's Evidence ¶ 504[01], 504–9; Goode at 420.

No consensus exists in court decisions on whether an expectation of privacy exists in medical records, even in the DWI context. *See Commonwealth v. Riedel,* 539 Pa. 172, 651 A.2d 135, 138 (1994)(reasonable expectation of privacy exists); *People v. Perlos,* 436 Mich. 305, 462 N.W.2d 310, 315–322 (1990)(no reasonable expectation of privacy exists); *Tims v. State,* —— So.2d ——, —— - ——, 1997 WL 592561, *3–*6 (Ala.Crim.App. 1997)(same); *State v. Fears,* 659 S.W.2d 370, 375–376 (Tenn.Crim.App.1983), *cert. denied,* 465 U.S. 1082, 104 S.Ct. 1450, 79 L.Ed.2d 768 (1984)(same). *See also Conrad,* slip op. at 6 n. 7 and cases cited therein. In *Riedel,* the Pennsylvania Supreme Court found a reasonable expectation of privacy but held that the statute in question requiring disclosure of the records was an adequate substitute for the warrant requirement under the Fourth Amendment. 651 A.2d at 178–183. In *Perlos,* the Michigan Supreme Court held that no reasonable expectation of privacy existed under the circumstances presented, to wit: in the results of a blood alcohol test conducted by hospital staff for medical purposes on an individual involved in a car accident. 462 N.W.2d at 316 & 321. The Michigan Court expressly declined to make a blanket holding that medical records were not protected by the Fourth Amendment. *Id.* at 321. *Perlos* noted that the statute in question required the disclosure of test results only under the following conditions: (1) when there is an accident, (2) when medical personnel draw blood and conduct a chemical test, (3) when they do so on their own initiative for medical purposes, (4) when the subject is the driver

of the vehicle, and (5) when the State makes a request for the records. *Id.* at 320. The Michigan Court also noted that the State could not gain unfettered access to all medical records but only to the chemical test results, nor could the authorities "obtain a blood sample for their own discretionary testing." *Id.* In supporting its limited holding, the Michigan Court analogized to various statutes requiring third parties to report to the government certain information, such as prescription drugs, child abuse, deadly weapon injuries, and financial activity. *Id.* at 321. In *Tims,* the Alabama Court of Criminal Appeals held that any expectation of privacy the defendant may have had in his medical records was unreasonable because of (1) the absence of any general physician patient privilege, (2) the existence of implied consent laws and other statutory laws granting prosecutors access to blood alcohol test results, and (3) society's strong interest in curtailing drunk driving. 1997 W.L. at *4, —— S.W.2d at ——. *Tims* found evidence both in the general medical records context and in the specific blood-alcohol test context that the Alabama Legislature did not recognize an expectation of privacy. 1997 W.L. at *3, —— S.W.2d at ——. The *Tims* court also relied in large part upon *Perlos* for its holding. *Id.* at *5, at ——. In *Fears,* the Tennessee Court of Criminal Appeals held that, like the bank records in *Miller,* medical records involved no reasonable expectation of privacy simply because the records were possessed by a third party.

Although a judicial consensus is absent, we find the strongest approach to be one that focuses on the unique circumstances of the DWI-accident scenario, as was done in *Perlos* and *Tims.* To begin with, the Supreme Court has held that certain intrusions do not involve expectations of privacy because of the limited nature of the intrusion by government agents and/or the previous frustration of privacy expectations by nongovernmental agents. "The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated." *United States v. Jacobsen,* 466 U.S. 109, 117, 104 S.Ct. 1652, 1658–59, 80 L.Ed.2d 85 (1984).

Privacy interests may be frustrated when a third party reveals confidential information to the government. *Id.* at 117, 104 S.Ct. at 1658–59 (citing *Miller*, 425 U.S. at 443, 96 S.Ct. at 1624). In *Jacobsen*, employees of a private freight company opened a package and determined that it contained a white powdery substance. 466 U.S. at 111, 104 S.Ct. at 1655. They then notified federal drug enforcement agents and invited those agents to the company office to examine the package and its contents, *Id.* at 111 & 119, 104 S.Ct. at 1655 & 1659. The federal agents reopened the package, obtained some of the powdery substance, and performed a chemical test to determine whether the substance was cocaine. *Id.* at 111–112, 104 S.Ct. at 1655–56. The Supreme Court held that the federal agents did not invade upon any reasonable expectation of privacy by reopening the package and physically examining the powdery substance because the expectations of privacy in the package had already been frustrated by the actions of nongovernmental third parties. *Id.* at 119–121, 104 S.Ct. at 1659–1661.

The Supreme Court next determined that the chemical test violated no reasonable expectation of privacy. *Id.* at 122–125, 104 S.Ct. at 1661–63. The test would merely show whether the substance was cocaine. *Id.* at 123, 104 S.Ct. at 1661–62. A positive test result would compromise no legitimate expectation of privacy because cocaine is contraband; and, a negative result would reveal nothing of special interest *Id.* While a seizure of the property occurred when the cocaine was tested—and indeed a small quantity was actually destroyed—the Supreme Court held that the seizure was reasonable in the absence of a warrant because of the law enforcement interests involved and because the destruction of a trace amount of cocaine had only a *de minimis* impact on the defendant's possessory interests in the property. *Id.* at 125, 104 S.Ct. at 1662–1663.

Many similarities exist between the present case and *Jacobsen*. With regard to the blood alcohol test results, appellee's expectations of privacy could potentially have been implicated at three different stages: (1) the physical intrusion into his body to draw blood, (2) the exercise of control over and the testing of the blood sample, and (3) obtaining the results of the test. But in the first two stages, appellee's expectation of privacy had already been frustrated by the actions of nongovernmental agents. The physical intrusion occurred and the blood was tested by medical personnel for medical purposes. While appellee definitely possessed a privacy interest in the former, *see Skinner* (cited above), and *may* have possessed a privacy interest in the latter, *see Comeaux* (plurality opinion, cited above), those interests were frustrated by the actions of medical personnel. The only question remaining is whether appellee had a reasonable expectation of privacy at the third stage—his test results.

A subpoena for blood alcohol and drug information about the driver in an automobile accident is somewhat analogous to the chemical test in *Jacobsen*. A subpoena directed solely at blood alcohol and drug tests would, like the chemical test in *Jacobsen*, be a very narrow investigatory method designed to elicit evidence for a very narrow purpose.

Moreover, in several contexts, Legislatures across the nation have conferred upon law enforcement officers the ability to obtain blood samples following traffic accidents. All fifty states have "implied consent" laws which provide that any person operating a motor vehicle on public highways is deemed to have given consent to chemical testing (without a warrant) after an arrest where an officer has reasonable grounds to believe that the suspect was driving in an intoxicated condition. Annotation, *Driving While Intoxicated: Subsequent Consent to Sobriety Test as Affecting Initial Refusal*, 28 A.L.R.5th 459, 472 (1995). Ordinarily, the "implied consent" provisions require the offending motorist to either submit to a chemical test or suffer suspension of his driver's license. *Id.* at 459. Many statutes also permit officers to conduct a chemical test (without a warrant) on an unconscious person under the theory that such person has not withdrawn his implied consent. Annotation, *Admissibility in Criminal Case of Blood Alcohol Test Where Blood Was Taken from Unconscious Driver*, 72 A.L.R.3d 325, 357–361 (1976); *Id.* at 28–29 (Supp.1997). Some statutes even permit ob-

taining a sample for chemical testing (without a warrant) from an unconscious person even when that person is not under arrest. *Id.* at 337–338 (1976); *Id.* at 26–27 (Supp. 1997). The universality of permission given by Legislatures in this country to law enforcement officers to conduct chemical tests on the roadside without obtaining a warrant is some evidence that the results of such tests should not be considered private. While implied consent statutes generally have some safeguards that may indicate deference to Fourth Amendment concerns, those statutes also permit intrusions that are significantly greater than present here. Such safeguards appear to us to be a recognition that an expectation of privacy in bodily integrity (withdrawing the blood) still exists even though society does not recognize as reasonable an expectation of privacy in the results of a test. But, in the case of blood test results obtained by subpoena, where the tests were conducted by medical personnel solely for medical purposes, the person's interest in bodily integrity is not presented.

■■■ We express no opinion concerning whether society recognizes a reasonable expectation of privacy in medical records in general, or whether there are particular situations in which such an expectation might exist. We note only that, given the authorities discussed, whatever interests society may have in safeguarding the privacy of medical records, they are not sufficiently strong to require protection of blood-alcohol test results from tests taken by hospital personnel solely for medical purposes after a traffic accident.

Accordingly, we affirm the judgment of the Court of Appeals.

PRICE, Judge, dissenting.

Believing a reasonable expectation of privacy exists in the test results of a person's blood analysis, I respectfully dissent.

## I. The Fourth Amendment

As stated by the majority, the issue is whether the government's acquisition of a written blood analysis violated appellee's Fourth Amendment constitutional right to privacy.[1] U.S. CONST. amend. IV. Specifically, appellee contends that he had a reasonable expectation of privacy in medical records retained by the hospital such that the United States Constitution prohibited their unreasonable seizure. If a privacy right did exist, then the State could not initiate a warrantless seizure without both probable cause *and* an excuse for not obtaining a search warrant that would withstand constitutional scrutiny.

To invoke the protections of the Fourth Amendment, the State, or its agent, must engage in action which constitutes a seizure and/or a search. Appellee's medical records have not been "seized" or "searched" under the Fourth Amendment, unless he had a legitimate expectation of privacy in them. *See Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). This determination compels a two-part inquiry: (1) whether appellee had a subjective expectation of privacy in his medical records and (2) whether this is an expectation that society is prepared to recognize as reasonable. *California v. Greenwood,* 486 U.S. 35, 39, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30 (1988) (citations omitted).

## II. Appellee's Subjective Expectation

It is difficult to discern the nature of appellee's expectations, at least on the night of the accident. After the investigating officer arrived on the scene, appellee was transported by Life–Flight to the hospital. Because of his injuries, appellee's active role in the events that took place after his arrival at the hospital is minimal. Appellee's blood tests were conducted solely under the direction of his attending physician.[2]

The State argues that appellee had no subjective expectation of privacy in the results of his blood tests because the tests

1. Because the court of appeals' arguments are based solely on the Fourth Amendment of the United States Constitution, this opinion omits any discussion of the Texas Constitution.

2. At the suppression hearing, the investigating officer testified that he did not go to the hospital on the evening of the accident, nor did he order any blood tests to be performed.

belong to the hospital, not appellee. The State also contends that this Court must utilize the rule that the issuance of a subpoena to a third party does not violate a defendant's rights. Relying on *United States v. Miller*, 425 U.S. 435, 444, 96 S.Ct. 1619, 1624–1625, 48 L.Ed.2d 71 (1976), the State directs the Court's attention to this general rule and explains that it applies "even if a criminal prosecution is contemplated at the time the subpoena is issued." The State's argument, however, oversimplifies the Supreme Court's analysis in *Miller*. The Supreme Court, following the general rule that a subpoena directed to a third party does not implicate a defendant's rights, concluded that there was no legitimate expectation of privacy in *financial records* maintained by a bank—viz., checks, deposit slips, financial statements and monthly statements. The Court focused on several factors in reaching this conclusion: (1) all the documents contained information that was voluntarily released to the bank; (2) checks are negotiable instruments intended for use in commercial transactions, not as confidential communications; and, (3) one stated purpose for enacting the federal law that requires banks to retain these records is "because they have a high degree of usefulness in criminal tax, and regulatory investigations and proceedings." *Id.* at 443–44, 96 S.Ct. at 1624–25 (internal quotations omitted). These characteristics of financial records refuted the defendant's claim that although they were in the possession of a third party, they were protected by a right of privacy that society would recognize as reasonable.

Medical records are not comparable to financial records. Medical tests are generally performed at the direction of the doctor and are necessary for effective diagnosis and treatment. While generated by and in the possession of a third party, unlike bank records, they are not documents intended to flow in the stream of commerce. Rather,

they exist as part of the process of ensuring that a person receives adequate medical care. As recently explained by this Court, "that certain facts may be revealed in the necessarily candid process of diagnosis and treatment does not mean we no longer have a collective interest in insulating them from public scrutiny." *Richardson v. State*, 865 S.W.2d 944, 952 (Tex.Crim.App.1993). When seeking medical treatment, patients assume that the information revealed to a doctor or nurse is private and shielded from disclosure. In fact, most people believe that the information contained in medical records is not accessible to even close family members. Therefore, it is fair to conclude that appellee harbored a subjective expectation of privacy in his medical records.[3]

### III. Society's Expectation

The question, then, becomes whether society is willing to recognize appellee's expectation as a reasonable one. The Fourth Amendment's protections do not rest on views of the citizens of an individual state, but rather, on a broader societal perspective. *Greenwood*, 486 U.S. at 43, 108 S.Ct. at 1630. Reviewing the decisions of those states which have addressed this issue, however, fails to yield a societal consensus on the protection accorded to medical records. Outside of the criminal context, courts have held that an individual possesses a substantial privacy interest in his or her medical records. *See McDonnell v. U.S.*, 4 F.3d 1227, 1253 (3rd Cir.1993) (recognizing privacy interest in medical records requested under Freedom of Information Act) and cases cited therein; *Tarrant County Hosp. Dist. v. Hughes*, 734 S.W.2d 675 (Tex.App.—Fort Worth 1987, no writ) (noting that medical records are within constitutionally protected zone of privacy). Courts reach different conclusions, however, when the same issue arises in a criminal proceeding.[4] Judges' votes are divided in

---

3. Noticeably absent from the majority opinion is any discussion concerning appellee's subjective expectation of privacy. Because the majority focuses solely on society's objective view, I presume that the majority found appellee possessed a subjective expectation of privacy.

4. *See Pollard v. State*, 439 N.E.2d 177, 183 (Ind. Ct.App.1982) (admitting evidence of blood tests results because: (1) no physician/patient privilege, (2) police had probable cause, and (3) no state action in obtaining the blood); *People v. Perlos*, 436 Mich. 305, 462 N.W.2d 310, 316 (1990) (determining no reasonable expectation of privacy in medical records involving DWI inves-

Texas courts which have held there is no reasonable expectation of privacy in medical records. *See Clark,* 933 S.W.2d at 334 (Yanez, J., concurring); *Thurman,* 861 S.W.2d at 101 (Cohen, J., concurring & joined by the other two panel judges).

It is logical to suppose that society might find reasonable an expectation of privacy in those matters of a personal nature as opposed to more public matters. The information that is disclosed through blood analysis is highly personal. It may contain such information as test results revealing that the patient is afflicted with a socially stigmatized disease, and graphic details of symptoms described by the patient in an effort to assist in obtaining an accurate diagnosis. Blood testing may disclose serious medical conditions or genetic disorders. As such, doctors understand the importance of maintaining the confidentiality of their patients' medical records. In addition, Section 5.08 of the Texas Medical Practice Act has only been repealed in the context of judicial proceedings. TEX. REV.CIV. STAT. ANN. art. 4495b § 5.08 (Vernon Supp.1997). Thus, in Texas, "physicians still have a duty of confidentiality, enforced, sub-

ject to certain enumerated exceptions, by statute." *Richardson,* 865 S.W.2d at 953 n. 7. Appellee, however, need not rely on any statutory indication that his medical records are confidential in order to show a societal willingness to accept his expectations as reasonable. He can simply rely on "understandings that are recognized and permitted by society." *Rakas v. Illinois,* 439 U.S. 128, 144 n. 12, 99 S.Ct. 421, 439 n. 12, 58 L.Ed.2d 387 (1978). As if reflective of society's expectations, physicians make affirmative efforts to ensure the confidentiality of those records. As we stated in *Richardson,* "[e]ven if doctor confidentiality is not enforced by law, medical ethics demand it. And in any event, it is doubtful the tattling physician would retain his clientele for long." 865 S.W.2d at 953 n. 7 (citations omitted). Thus, I would hold that appellee has a constitutionally protected right to privacy in his medical records.[5]

## IV. The Search

This conclusion, however, does not end the inquiry. Now, it is necessary to determine if a grand jury subpoena involves action by a

---

tigation); *State v. Copeland,* 680 S.W.2d 327, 330 (Mo.App.1984) (holding defendant had a reasonable expectation of privacy in blood sample drawn by hospital); *State v. Dyal,* 97 N.J. 229, 478 A.2d 390, 391 (1984); (holding that a subpoena for medical records may be issued only on a reasonable basis, thus implying a privacy interest); *Commonwealth v. Riedel,* 539 Pa. 172, 651 A.2d 135, 139 (1994) (finding a reasonable expectation of privacy in medical records); *State v. Fears,* 659 S.W.2d 370, 376 (Tenn.Crim.App. 1983) (finding no Fourth Amendment protected privacy interest in medical records kept by health center); *State v. Conrad,* CR-T1-97-23-133, slip. op. (Tex.App.—Houston [14th Dist.] delivered May 22, 1997, no pet. h.) (determining that reasonable expectation of privacy does exist in medical records), *but see Knapp v. State,* 942 S.W.2d 176 (Tex.App.—Beaumont 1997, no pet. h.) (relying on recent courts of appeals' opinions to find no state action in grand jury subpoena and no privacy right in medical records because of repeal of physician/patient privilege); *Clark v. State,* 933 S.W.2d 332 (Tex.App.—Corpus Christi 1996, no. pet.) (finding no state action and no physician/patient privilege); *Corpus v. State,* 931 S.W.2d 30 (Tex.App.—Austin 1996, pet. granted) (declaring that repeal of physician/patient privilege eliminated privacy interest in medical records); *Thurman v. State,* 861 S.W.2d 96 (Tex. App.—Houston [1st Dist.] 1993, no pet.) (explaining that this Court's rejection of physician/patient

privilege is evidence that society finds no reasonable expectation of privacy in medical records); *State v. Jenkins,* 80 Wis.2d 426, 259 N.W.2d 109, 113 (1977) (holding no reasonable expectation of privacy in medical records because of statutory exception to physician/patient privilege in homicide trials).

5. The majority concludes that society would not find a reasonable expectation of privacy in blood test results "taken by hospital personnel solely for medical purposes after a traffic accident." *Maj. Slip Op.* at 518. Judge Keller supports this conclusion by comparing the present situation to those situations covered by "implied consent" laws. It is true that those laws are "some evidence" that the results of blood tests are not always private, but "implied consent" statutes are narrowly drafted to apply to specific situations. In Texas, for example, the "implied consent" statute authorizes the *involuntary* taking of a blood sample *only if* the person is under arrest for operating a motor vehicle involved in an accident in which a person has died or will die as a result of the accident. *See* TEX. TRANSP. CODE ANN. §§ 724.011—724.064 (Vernon 1997) (emphasis added). If legislatures desired for "implied consent" laws to extend to the circumstances of the present case, they could have acted. Because they did not, the majority should not take it upon themselves to do so.

governmental actor, as constitutional prohibitions do not apply to actions of private citizens. *U.S. v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). In other words, state action equivalent to a search or seizure must be involved to trigger the protection of the Fourth Amendment. A grand jury subpoena plainly constitutes state action. *Boyle v. State,* 820 S.W.2d 122, 129–30 (Tex.Crim.App.1989). This leads to the further question of whether the state's use of a grand jury subpoena is conduct tantamount to a search or seizure of appellee's medical records.

Despite being given broad powers to investigate, the power of the grand jury is not without limits. *U.S. v. R. Enterprises, Inc.,* 498 U.S. 292, 297 & 299, 111 S.Ct. 722, 725–26 & 727, 112 L.Ed.2d 795 (1991). The mere issuance of a grand jury subpoena is· not "some talisman that dissolves all constitutional protections." *United States v. Dionisio,* 410 U.S. 1, 11, 93 S.Ct. 764, 770, 35 L.Ed.2d 67 (1973). Unlike the instant case, most cases upholding the broad inquisitive rights of grand juries involve business records or tax-related documents. LaFave, 2 *Search and Seizure: A Treatise on the Fourth Amendment* § 4.13(e) (1987), at 383. The Supreme Court has noted the corporate character of these documents when conducting its Fourth Amendment analysis. *Oklahoma Press Pub. Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946). Additionally, the Court has stated that "corporations can claim no equality with individuals in the enjoyment of a right to privacy." LaFave at 383, *citing United States v. Morton Salt Co.,* 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950).

The Supreme Court has yet to determine whether a grand jury subpoena for medical records invades a person's reasonable expectation of privacy and would constitute a search and, therefore, be subject to the same scrutiny—under the Fourth Amendment— that a search warrant is. Several courts, including the Supreme Court, which have examined the constitutionality of a grand

jury subpoena ordering a defendant to provide a blood sample consistently hold that such a directive does involve a Fourth Amendment search. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) [6]; *In re Grand Jury Proceedings (T.S.),* 816 F.Supp. 1196 (W.D.Ky.1993); *Henry v. Ryan,* 775 F.Supp. 247 (N.D.Ill. 1991); *People v. Marquez,* 152 Ill.2d 381, 178 Ill.Dec. 406, 604 N.E.2d 929 (1992); *Woolverton v. Multi-County Grand Jury,* 859 P.2d 1112 (Okla.Crim.App.1993).

Certain other physical evidence, on the other hand, may be constitutionally obtained through a grand jury subpoena. In the context of subpoenas for a handwriting or voice exemplar, the Supreme Court determined that the Fourth Amendment offers "no protection for what 'a person knowingly exposes to the public' ... No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world." *Dionisio,* 410 U.S. at 14, 93 S.Ct. at 771–72 (citations omitted). *Dionisio* and its companion case, *United States v. Mara,* 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973), held, respectively, that subpoenas for a voice exemplar or a handwriting exemplar did not rise to a search under the Fourth Amendment because there was no reasonable expectation of privacy in a person's voice or handwriting.

Here, the governmental invasion was less intrusive than a subpoena for a blood sample—the subpoena required the hospital to release medical records containing the results of appellee's blood tests. Appellee was not forced to provide a blood sample, nor was the subsequent blood analysis performed at the behest of the State. However, the rationales of the blood sample cases, which held that a subpoena did constitute a search, more logically extend to appellee's situation than the rationales of the exemplar cases. Medical records containing the results of a blood analysis are not commensurate with physical characteristics knowingly exposed to the public. One's physical traits are generally

---

**6.** The Supreme Court held that the compelled warrantless extraction of blood is reasonable when probable cause to arrest exists *and* exigent

circumstances are present. *Schmerber,* 384 U.S. at 768–69, 86 S.Ct. at 1834–35 (emphasis added).

exposed to the public upon leaving one's home. Medical records, in contrast, contain information which could rarely be gleaned by simply observing a person's outward appearance. A person does *voluntarily* submit to a medical exam, or is in such a serious medical condition that an affirmative statement of submission is unobtainable and presumed, but, this information is acquired and used solely for diagnosis and treatment. It is voluntary only in the sense that it is necessary to receive, what may often be, life-sustaining treatment. Once obtained, it may not be browsed through as if it were public record or generally observed by the passerby on the street. The fact that medical records are retained by a doctor or hospital, and are not solely within the appellee's control, should not erode the privacy protections of the Fourth Amendment. Because of the personal and intimate nature of information contained in medical records, I would hold that a grand jury subpoena for such documents intrudes on a reasonable expectation of privacy and constitutes a search under the Fourth Amendment.

### V. Reasonableness

The final constitutional question remains: Was this "search" reasonable under the Fourth Amendment? Here, the grand jury did not obtain a warrant, supported by probable cause and issued by a neutral magistrate, to "search" appellee's medical records. Absent an arrest, the minimum constitutional requirements for a warrantless search are (1) probable cause that incriminating evidence will be uncovered and (2) exigent circumstances justifying the search. *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). This case presents no exigent circumstances. There is little danger that appellee would destroy the evidence or that a delay in obtaining a search warrant would impede the grand jury's investigation. Medical records, unlike alcohol in one's blood, does not dissipate over time and justi-

fy an immediate search. *See Schmerber*, 384 U.S. at 770–71, 86 S.Ct. at 1835–36. Additionally, it is unclear from the present record whether probable cause existed prior to the subpoena of appellee's medical records.[7] Absent this preliminary showing of probable cause, a grand jury subpoena for medical records fails to satisfy the requirements of the Fourth Amendment. Since no constitutionally acceptable excuse was proffered precluding the procurement of a warrant, I would hold that the grand jury subpoena was an unreasonable search of appellee's medical records, thus violating his constitutional rights emanating from the Fourth Amendment.

I would reverse the judgment of the court of appeals and affirm the trial court's decision to grant appellee's motion to suppress. Because the majority holds otherwise, I dissent.

BAIRD, OVERSTREET and MEYERS, JJ. join.

BAIRD, Judge, dissenting to denial of appellee's motion for rehearing.

The majority's denial of rehearing in this case wholly ignores appellant's argument that the Legislature's re-enactment of § 5.08(g)(8) of the Texas Medical Practices Act, as Tex.Rev.Civ. Stat. art. 4495b § 5.08(g)(10), should have been considered on original submission in determining whether appellant's subjective expectation of privacy in his medical records was one society recognized as reasonable.

I admit to not being aware of the re-enactment. Whether the other judges were aware, I will not hazard to guess. However, it seems to me, the legislative action should have been addressed in both the majority and dissenting opinions. When a motion for rehearing brings to the attention of the Court relevant authority that was not considered on original submission, we should not deny the motion out of some sense of embar-

---

**7.** In its findings, the trial court stated that the investigating officer "formed the opinion that [appellee] was intoxicated." The record reveals that the officer formed this opinion on the night of the accident. Nevertheless, the officer did not arrest appellee until after he reviewed appellee's medical records. At the suppression hearing, the trial judge prohibited discussion on the issue of probable cause. Accordingly, the existence of probable cause was not fully litigated and is not apparent on the face of this record.

rassment, but rather embrace the motion as an opportunity to provide the bench and bar with a correct, full and cogent analysis and resolution of the issue presented.

Accordingly, I dissent to the denial of appellant's motion for rehearing.