

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00101-CR
No. 02-22-00102-CR
No. 02-22-00103-CR
No. 02-22-00104-CR
No. 02-22-00105-CR
No. 02-22-00106-CR

_____

CHRISTOPHER STEPHENSON, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 462nd District Court
Denton County, Texas
Trial Court Nos. F20-1623-462, F20-1624-462, F20-1625-462, F20-1626-462,
F20-1627-462, F20-1628-462

Before Sudderth, C.J.; Bassel and Womack, JJ.
Opinion by Chief Justice Sudderth

## OPINION

Appellant Christopher Stephenson sexually abused four of his wife's children. A jury convicted him of two counts of continuous sexual abuse of a young child under the age of 14, three counts of sexual assault of a child under the age of 17, and one count of indecency with a child under the age of 17. *See* Tex. Penal Code Ann. §§ 21.02(b), 21.11(a), 22.011(a)(2). Stephenson appeals his convictions and raises a slew of issues, which we construe as six: two Sixth Amendment challenges, one sufficiency challenge, one evidentiary challenge, and two Double Jeopardy challenges. Although one of his Double Jeopardy challenges presents an issue of first impression, none of his arguments unearth error, much less reversible error. Accordingly, we will affirm.

## I. Background

Christopher Stephenson married a woman—B.S. (Brittney)[1]—who had nine children. The family had already been through a lot when Stephenson entered the picture.

### A. Before Stephenson

Brittney's nine children had four different fathers. In 2009, one of those fathers shot and killed Brittney's oldest child. After the death, the Department of Family and Protective Services—commonly referred to as Child Protective Services (CPS)—

---

[1]Pseudonyms are used for the minor victims and their mother. *Cf.* Tex. R. App. P. 9.10(a)(3).

removed Brittney's remaining children[2] from her home for about six months. The children were initially placed in foster homes before CPS transferred them to their uncle's care, but that transfer was not an improvement; one of Brittney's daughters—C.W. (Courtney)—later reported that the uncle had anally raped her.[3] Needless to say, even after the children were ultimately reunited with their mother, they were "all scared because of [the experience]."

Stephenson began a relationship with Brittney a few years later,[4] and he was aware of this CPS history.

## B.    Stephenson's Sexual Abuse

Brittney and Stephenson married in January 2014. For the majority of the six years that followed, Brittney worked long hours and had a lengthy commute, while Stephenson was unemployed. Left at home with the children, Stephenson sexually abused four of them:  Courtney, S.R. (Simon), R.R. (Rebecca), and T.R. (Tina).

---

[2]Brittney's two youngest children had not yet been born at the time of the murder.

[3]The sexual assault case against the uncle was "no-bill[ed]" by the grand jury.

[4]The couple began dating in mid-2013.

### 1.    Courtney

Courtney was Brittney's oldest surviving daughter.  Born in 2002, she was 11 years old when Stephenson married her mother.  Within about six months, Stephenson started abusing her.

At first Stephenson grabbed Courtney's breasts, butt, and inner thigh, claiming it was "on accident."  Then he began "repetive[ly]" slipping his hand under her blanket during family movie nights and touching and rubbing her vaginal area.  Stephenson also came into Courtney's bedroom when she was alone and digitally penetrated her, asking her if she liked it.  And on one occasion, he anally raped her, leaving her with blood and semen running down her legs.

Brittney later recalled how, around this time, Stephenson began referring to Courtney as "[h]is girlfriend," despite her being 11 or 12 years old.  Brittney told him that it "was highly inappropriate" and that "it needed to stop," but Stephenson insisted "it was a joke."

Stephenson continued to digitally penetrate Courtney and ask her if she liked it, and then when she was 12 years old, he progressed to vaginally raping her, increasing in frequency until he was raping her "three, four times a week."  The "very regular vaginal raping" continued through her 14th birthday in March 2016.

Even after she turned 14, it did not stop; the rapes were, in Courtney's words, "very repetitive, very constant."

The next year, on her 15th birthday, Courtney tried to run away with her boyfriend.[5]  When she returned home, Stephenson insisted on inspecting her underwear, he accused her of "whor[ing] around," and then he raped her again.  At that point, the rapes increased to "almost every day."[6]

In October 2018, when Courtney was 16 years old, she, her mother, and Stephenson attended a concert, and Stephenson told Courtney that she "owed him for that" by not only having sex with him but also "acting like [she] enjoyed" it and performing oral sex.[7]  Courtney's birth control had lapsed at the time, and she soon realized she was pregnant.

Stephenson took Courtney to get an abortion, but she was too far along in the pregnancy by then, so, in an attempt to force a miscarriage, he "started hitting [her] in the stomach, punching [her], kicking [her], [and] shoving [her] down" on an almost daily

---

[5]Stephenson had been incarcerated for a different crime in 2016, so he was not in Courtney's home for several months leading up to her 15th birthday in March 2017.

[6]Courtney recalled that when her mother was at work, Stephenson would send the other children to play outside, and he would rape her.

[7]Courtney described how Stephenson often urged her to "be more engaged," telling her to "grab up on him."  If she resisted, he would "yell[ and] curs[e]" in frustration.

basis.[8]  Meanwhile, he continued to rape and inappropriately touch her "[a]lmost every day."

When Courtney was about seven months pregnant, she began bleeding profusely, and she was taken to the hospital where she gave birth to a stillborn baby girl.  Courtney later explained that she "didn't want to get beat more by telling the truth" about the father's identity, so she lied and claimed the father was a boy at school.

Soon after the birth, Stephenson resumed raping Courtney.[9]  He had grown increasingly physically abusive as well;[10] when Courtney "said no, [she] would get kicked into a dresser or hit in the back or screamed at."

---

[8]On one occasion, Stephenson "punched [Courtney] extremely hard, where [she] . . . could not move for multiple hours . . . because it just hurt so incredibly bad."

[9]Not long after the birth, Stephenson moved out of the house for two months (for reasons explained below), so he directed Courtney to meet him "once or twice a week" so he could rape her.

[10]Multiple other children testified to Stephenson's physical abuse.  Simon and Tina both referenced Stephenson's general "rule [that] if [they] hit, he would hit back"—and often "hit [back] harder."  Tina described how Stephenson would get a belt, a wood paddle, or a whip, and "just starting hitting."  She remembered having marks or bruises on her back and legs from the abuse.  And the victims' oldest brother recalled one time when he was 17 and saw Stephenson touching Courtney inappropriately.  The brother told Stephenson not to touch his sister, but Stephenson responded that he "w[ould] do what [he] want[ed]," then he "swung [the brother] around on the floor and got on top of [him] and started to strangle [him]."

Courtney recalled not only the physical abuse but also the threats of abuse.  She later told a nurse how Stephenson threatened to "beat [her] and put [her] in the hospital" if she "played him."

6

Courtney graduated from high school in mid-2020, and Stephenson urged her to move into his friends' home so he and she could "get married and start [their] own lives together." Instead, Courtney—feeling so trapped that she penned a suicide note—finally told her mother about the sexual abuse.

### 2. Simon

Simon was also a victim of Stephenson's abuse. Simon was born in 2003 and was 10 years old when Stephenson married his mother. He testified that Stephenson grabbed his penis "about three times" over the years that followed.

The first incident occurred when Simon was 13. He was playing a video game on his bed, and Stephenson came in, started joking around, then grabbed Simon's penis and tugged. When asked if Stephenson said anything at the time, Simon remembered that he "just laugh[ed]."

The second incident was similar. When Simon was 15, Stephenson came into Simon's room and again grabbed his penis while he was playing a video game on his bed. But this time, Stephenson asked him, "Do you like that?" When Simon responded negatively and pushed Stephenson away, Stephenson got angry and "started yelling at [Simon] for hitting him," stating that he would fight Simon "like a man, one-on-one." Stephenson also "threaten[ed Simon] with CPS," which—due to the family's prior CPS experience—Simon feared would "split the family apart." At that time, Stephenson told Simon "that he [wa]sn't gay and that he only like[d] women and that all of it was a joke." Simon, though, testified that he did not think it was a joke.

In the third touching incident, Simon was riding in the front seat of Stephenson's truck, and Stephenson reached for Simon's penis, but Simon managed to push his hand away.[11]

Simon told the jury that, on multiple occasions, Stephenson verbalized his concern that Brittney would look at him (Stephenson) differently if Simon told her about the touching. And Simon reiterated how Stephenson used CPS-related threats to keep him quiet. Stephenson repeatedly warned Simon that, if he told, CPS would take Simon from his mother and siblings just as it had in the past. So although Simon was "sometimes . . . tempted" to tell, he "was always scared because [he] didn't like CPS."

Despite this fear, in 2020, Simon disclosed his abuse while being forensically interviewed as a witness to Stephenson's sexual abuse of Courtney.

---

[11]In addition to the touching, Simon recounted an incident when Stephenson "burst out of the shower and he was unclothed, and he ran at [Simon] full speed." Stephenson was smiling while he ran, saying "I'm going to get you." Simon hid under a bed to avoid him.

### 3. Rebecca

In addition to Courtney and Simon, Stephenson sexually abused Rebecca. Rebecca was born in 2005, so she was eight when Stephenson married her mother. Although the family did not know it at the time, Rebecca is autistic.[12]

She testified that, when she was in sixth grade, Stephenson "made [her] use [her] mouth on his man private part." She remembered him repeating this type of sexual abuse between three and five times over the two years that followed.

He committed other acts of sexual abuse during this same time period as well, "[b]asically, all throughout [Rebecca's time in] middle school." On one occasion, he made her touch "his private part." On another, he lay down beside her on her bed and digitally penetrated her. Rebecca remembered how, when he penetrated her, Stephenson "asked [her] if [she] liked it."

She also recalled his saying multiple times that if she told anyone, "CPS w[ould] get involved." She explained that she "was afraid of that because [she] didn't want to lose [her] mom or [her] siblings." Rebecca told her father about Stephenson's abuse in June 2019, just a few weeks after her 14th birthday.

---

[12]Rebecca's father testified that she had been diagnosed with autism and that the condition limited her ability to articulate information. While Tina told him about specific instances of abuse, Rebecca described the abuse more generally.

### 4. Tina

Stephenson also abused Tina. Tina—born in 2006—was seven when Stephenson married her mother.

Stephenson first inappropriately touched Tina about three years later, when she was around the age of 10. On that occasion, Stephenson took her four-wheeling. During that excursion, he drove them off the main trail, made her touch "his front private area," and then "touched [her] front private area" in turn. Stephenson told Tina that such touching was "how people show love," and he told her not to tell anyone. He continued to touch her during subsequent four-wheeler rides, "maybe twice a month."

Later, when Tina was 11 or 12 years old, Stephenson began coming into her room at night and "touching [her] in [her] front private area" underneath her clothes. Tina testified that this occurred about "three times a week" until she was 13, and that each time, he would ask her if she enjoyed it.

She also described how, during family movie nights, Stephenson would tell her to lie down beside him, he would put a blanket on top of them, and he would digitally penetrate her vaginally or grab her butt.[13] And when she was alone with him in his truck, he did the same thing, inappropriately touching her on approximately ten separate truck rides.

---

[13]Tina testified that when Stephenson began asking one of her younger sisters to lie next to him under the blanket, she would distract her sister or "sacrifice [her]self so it would never happen to the youngest."

Like her siblings, Tina remembered Stephenson using threats of CPS to scare her into secrecy. But in mid-2019—before Tina turned 14—she was spending a weekend with her father's family, and she told her cousin[14] that Stephenson had sexually abused her.[15] The news made its way to Tina's father—who was also Simon's and Rebecca's father. He asked Rebecca and Tina about the abuse, and both girls confirmed what Stephenson had done to them. The father contacted law enforcement and was soon put in touch with CPS.

## C.    Outcries and Mounting Evidence

Both a criminal investigation and a CPS investigation followed. Rebecca and Tina submitted to forensic interviews and sexual assault nurse examinations (SANEs), and both girls repeatedly and consistently recounted Stephenson's acts of abuse. Nonetheless, after about two months, CPS's case was closed as "inconclusive." As for the police investigation, it was "paused" for several months, then when "the world shut down for COVID," it was not pursued.[16] Although Brittney had agreed to make

---

[14]The cousin, who testified, explained that she and Tina were not technically cousins because of a divorce in the family and because they were not related by blood.

[15]Prior to Tina telling her cousin in June 2019, Tina had overhead Rebecca confiding in a younger sister about her abuse, and Tina had revealed to Rebecca that she was a victim as well. Then, in May 2019, Tina and Rebecca told their mother about Stephenson's abuse. Brittney confronted Stephenson, but Stephenson denied it, so nothing happened.

[16]Investigator Michelle Haiduk of the Denton County Sheriff's Office explained that, in early 2020—after Rebecca and Tina gave consistent statements in another round

Stephenson leave the home during CPS's investigation, when that investigation closed in August 2019, he moved back in.

Finally, in mid-2020, Courtney outcried. While the family was on a vacation without Stephenson, Courtney told her mother about Stephenson's abuse. Brittney immediately moved out with the children, and she contacted Investigator Haiduk to report Courtney's outcry.

Courtney submitted to a forensic interview and SANE, and all of her siblings were interviewed or re-interviewed as potential witnesses. During Simon's witness interview, he revealed that Stephenson had sexually abused him as well.

Meanwhile, Investigator Haiduk sent Courtney's SANE samples for testing, along with a gown that had been worn by her stillborn baby. The vaginal swabs from Courtney's SANE tested positive for semen, and Stephenson "could not be excluded" as a DNA contributor, meaning that the markers from Stephenson's DNA appeared to match those on the swab. A DNA test of the stillborn baby's gown was even more incriminating—it revealed that Stephenson was almost certainly the father of Courtney's baby; "99.9999999999 percent of the population, would be . . . expected to be excluded" as the father, but Stephenson could not be excluded.[17]

---

of forensic interviews—she was preparing the case for the grand jury, but then the COVID shutdown caused the case to stall.

[17]The DNA analyst explained that DNA results are reported based on likelihood ratios, which is the ratio between two numbers: the likelihood that the person is the father and the likelihood that he is not. Using this calculation, it was "280 trillion times

**D.     Trial Court Proceedings**

Stephenson was indicted for

- continuous sexual abuse of Courtney from 2014 to 2016 when she under age 14, *see* Tex. Penal Code Ann. § 21.02(b);

- continuous sexual abuse of Rebecca and Tina from 2017 to 2019 when they were under age 14, *see id.*;

- one count of sexual assault of Courtney in 2017 when she was under age 17, *see id.* § 22.011(a)(2);

- a second count of sexual assault of Courtney in 2018 when she was under age 17, *see id.*;

- a third count of sexual assault of Courtney later in 2018 when she was under age 17, *see id.*; and

- indecency with Simon by contact in 2015 when he was under age 17, *see id.* § 21.11(a)(1).[18]

All six cases were tried together.

The evidence at trial was plentiful and egregious.  Each of the victims testified,[19]

as did Brittney, two of the victims' siblings, Investigator Haiduk, the person who had

---

more likely . . . that Christopher Stephenson [wa]s the true biological father of the [stillborn baby] than if the father [was a different] . . . random man from the Caucasian population."

[18]Stephenson was indicted for indecently touching Simon in June 2015, but Simon was 11 years old in June 2015, and the evidence showed that Stephenson first grabbed his penis when he was 13 years old.

[19]At the time of trial, Courtney was 20, Simon was 18, Rebecca was 16, and Tina was 15.

13

performed the relevant DNA tests, and numerous other witnesses. The jury also received copies of the various SANE reports, copies of the DNA lab results, copies of Stephenson's inappropriate Facebook messages to and about Courtney, medical records related to Courtney's pregnancy, and birth and death records for her stillborn baby. Stephenson did not present any witnesses or exhibits in his own defense.

Three trial developments are relevant to this appeal.

### 1.      Concession of Guilt

First, Stephenson's trial counsel conceded—on multiple occasions—that Stephenson had impregnated Courtney when she was 16. His opening statement acknowledged that Stephenson and Courtney had sex when she was 16, that "she was impregnated, [that] she had a stillborn baby," and that Stephenson was "guilty of a second-degree felony of sexual assault against [Courtney] for that." His cross-examinations were also peppered with references to this admitted impregnation. Through leading questions, Stephenson's counsel effectively told Brittney (and the jury) that "we know for sure that [the baby] was [Stephenson's] child," and that "we know for sure that when [the baby] was conceived, Stephenson would have had to have had sexual intercourse with [Courtney] when she was 16." He then repeated the concession in his closing, acknowledging "[t]hat child [i.e., Courtney's stillborn baby] was Chris's," and "[h]e is guilty of sexual assault on that [cause number]." Counsel used this concession to argue, though, that "just because [Stephenson] did one bad thing doesn't

14

mean [he] did every bad thing," and he claimed that "every other charge ha[d] no evidence" and required the jury to "just believe somebody when they sa[id] it."

## 2. Exclusion of Testimony Regarding Sexual Allegations

In the second relevant trial development, Stephenson attempted to cross-examine Investigator Haiduk regarding "other sexual activity happening in that house with these kids." When the State objected to the evidence as irrelevant hearsay, the trial court sustained the objections, and it excused the jury to allow Stephenson to "make an offer of proof on [that] line of question[ing]."

Outside the jury's presence, the investigator explained that Stephenson and his mother had told her that Simon might have had sex with Rebecca and Tina in "2018ish, 2020ish." Investigator Haiduk noted, though, that she never found any evidence to corroborate these allegations. Stephenson argued that Investigator Haiduk should be permitted to testify about the allegations because they went "towards the credibility of S[imon] and R[ebecca]" and "should be relevant." He claimed that Rebecca's descriptions of Stephenson's abuse had changed over time, and he argued that her "graphic" trial testimony was "essentially describing what she did with S[imon] and not with [Stephenson]."[20] The State responded by repeating its arguments that the evidence

---

[20]Stephenson's counsel told the trial court that he did not intend to ask Investigator Haiduk about the allegations that Simon was having sex with Tina because Tina "was much more descriptive" regarding the abuse while Rebecca "was extraordinarily vague."

15

was irrelevant and that it was hearsay, and it added an objection under Rule 412. *See* Tex. R. Evid. 412(a). Prior to excluding the testimony, the trial court offered Stephenson an opportunity to respond to the State's amended objections, but he declined to do so, saying he had "[n]othing else" to add.

### 3. Punishment Testimony

Third, Stephenson was not called to testify during the punishment phase. Although a record was made documenting his decision not to testify at the guilt–innocence phase, no comparable record was made of his decision not to testify at punishment. Rather, moments after the State rested its punishment case, Stephenson's counsel rested, and the trial court proceeded to read the punishment charges to the jury. Stephenson did not vocalize any objection to this trial progression, nor did he vocalize any desire to testify.

### 4. Conviction and Punishment

The jury convicted Stephenson of all six counts, and it returned the maximum punishment for each. *See* Tex. Penal Code Ann. §§ 12.32(a), .33(a). The trial court sentenced Stephenson, and judgment was entered accordingly.

## II. Discussion

Stephenson's briefs raise what we construe as six issues: (1) two Sixth Amendment challenges, (2) a sufficiency challenge, (3) an evidentiary challenge, and (4) two Double Jeopardy challenges.[21]

### A. Sixth Amendment Challenges

Stephenson's two Sixth Amendment challenges allege violations of his right to make critical decisions in his case. He claims that this right was violated by (1) his trial counsel conceding guilt to his impregnation of Courtney and (2) his trial counsel failing to call him as a punishment witness. The record is insufficient to sustain either claim.

### 1. Decision to Concede Guilt

First, Stephenson argues that his trial counsel disregarded his decision to maintain his innocence and—in violation of his Sixth Amendment right to make that critical decision—conceded that Stephenson had impregnated Courtney when she was 16.[22]

---

[21]Although Stephenson's cases were tried together, he treats this as three separate appeals and has filed three separate briefs—one for the crimes against Courtney (cause numbers 02-22-00101-CR, 02-22-00103-CR, 02-22-00105-CR, and 02-22-00106-CR); one for the crime against Rebecca and Tina (cause number 02-22-00104-CR); and one for the crime against Simon (cause number 02-22-00102-CR). His briefs list a total of nine issues, many of which overlap. We read his briefs together and consolidate his overlapping issues for simplicity and organization.

[22]Stephenson indicates that this appellate issue is intended to challenge his conviction in cause number 02-22-00101-CR for continuous sexual abuse of Courtney because his counsel "conceded guilty to a lesser[-]included offense" of continuous sexual abuse. But Stephenson was convicted in a separate cause number—cause

17

A criminal defendant has a Sixth Amendment right "to decide [whether] the objective of the defense is to assert innocence." *McCoy v. Louisiana*, 138 S. Ct. 1500, 1505, 1508 (2018). This is distinct from the defendant's right to decide his plea; the defendant is entitled "to decide on the objective of his defense[—]to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." *Id.* at 1505. A defendant's contention that his right to make this decision has been violated is often referred to as a *McCoy* complaint based on the landmark Supreme Court case on the topic. *See id.* at 1505–12.

But in *McCoy*, the Supreme Court noted that the defendant's "vociferous," "express statements of [his] will to maintain innocence" distinguished his situation from prior case law in which the defendant failed to protest his counsel's strategy and no Sixth Amendment violation was apparent. *Id.* at 1505, 1507–10 (distinguishing *Florida v. Nixon*, 543 U.S. 175, 178–92, 125 S. Ct. 551, 555–63 (2004)); *see Ex parte Barbee*, 616 S.W.3d 836, 844–45 (Tex. Crim. App. 2021) (explaining that *McCoy* was "a logical extension of *Nixon*" and "merely required factually what *Nixon* explicitly lacked: a defendant's express objections to a concession of guilt disregarded by counsel and court

---

number 02-22-00106-CR—for the conceded conduct, i.e., for sexually assaulting Courtney and impregnating her when she was 16. And because that particular sexual assault occurred when Courtney was 16, it could not have been a predicate offense for continuous sexual abuse. *See* Tex. Penal Code Ann. § 21.02(b)(2)(A) (limiting offense to acts committed against a child under 14).

and aired before a jury during trial"). "[A] defendant cannot simply remain silent before and during trial and raise a *McCoy* complaint for the first time after trial"; he must "present[] 'express statements of [his] will to maintain innocence.'" *Turner v. State*, 570 S.W.3d 250, 276 (Tex. Crim. App. 2018) (quoting *McCoy*, 138 S. Ct. at 1509); *see Barbee*, 616 S.W.3d at 845; *Martinez v. State*, No. 13-18-00621-CR, 2020 WL 4381997, at *5 (Tex. App.—Corpus Christi–Edinburg July 30, 2020, pet. ref'd) (mem. op., not designated for publication) ("Texas does not require a trial court to address a claim of *McCoy* error until it is brought to its attention.").

Stephenson made no such express statements here. His trial counsel's concession—that Stephenson had impregnated Courtney—was repeated numerous times and at different stages throughout trial, and Stephenson did not object in any of those instances. Nor is there anything in the record showing that he asked the trial court to appoint new counsel on this basis. He even testified outside the presence of the jury at one point, giving him a prime opportunity to notify the trial court of the complaints he now raises on appeal.[23] But he did not mention anything about the concession. Although Stephenson pleaded not guilty, he did not object to his counsel's statements, inform the trial court of his disagreement with his counsel's trial strategy, or otherwise express dissatisfaction with the concession of guilt. *See Barbee*, 616 S.W.3d

---

[23]While Stephenson's testimony outside the jury's presence focused on documenting his decision not to testify, it nonetheless provided him with a jury-free environment in which he could have notified the trial court of his concerns.

at 845 (holding that evidence defendant told his attorneys he was innocent and would not plead guilty did not satisfy *McCoy* because it did not "demonstrate that he told [his attorneys] that his defensive objective was to maintain his innocence at trial"). Even after the trial ended and his appellate counsel was appointed, Stephenson's motion for new trial did not mention his alleged dissatisfaction with his trial counsel's performance.[24]

We cannot presume a *McCoy* error based on a silent record. Because there were no express statements of Stephenson's desire to maintain his innocence, he has not presented a sufficient record to sustain his *McCoy* complaint. *See Barbee*, 616 S.W.3d at 845–46. We overrule this issue.

### 2. Decision to Testify

The record is similarly insufficient to support Stephenson's argument that he was denied the right to decide whether to testify at punishment. A defendant has a Sixth Amendment right to make this decision, *McCoy*, 138 S. Ct. at 1508, but we cannot presume that the right was violated on the face of a silent record.

We held as much in *Thompson v. State*. Nos. 02-18-00230-CR, 02-18-00231-CR, 02-18-00232-CR, 2019 WL 1065925, at *4–6 (Tex. App.—Fort Worth Mar. 7, 2019, pet. ref'd) (mem. op., not designated for publication). There, the defendant argued that

---

[24]Stephenson filed a motion for new trial to challenge his conviction for impregnating Courtney, but he did not file a motion for new trial to challenge his conviction for continuous sexual abuse of Courtney.

20

his Sixth Amendment right to testify had been violated by his trial counsel's failure to call him as a witness. *Id.* at *3. He claimed—as Stephenson does here—that our review of the alleged error should follow the framework set forth in *McCoy*. *Id.* at *3, *5. But we noted that Texas courts generally analyze "a defendant's complaint that his right to testify was denied by his counsel . . . under [the] ineffective-assistance-of-counsel framework" established in *Strickland v. Washington*. *Id.* at *4; *see Johnson v. State*, 169 S.W.3d 223, 235 (Tex. Crim. App. 2005) (holding in pre-*McCoy* case that because "defense counsel shoulders the primary responsibility to inform the defendant of his right to testify, . . . *Strickland* provides the appropriate framework for addressing an allegation that the defendant's right to testify was denied by defense counsel"). *See generally Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

Nevertheless, under either framework, the defendant's claim required a sufficient record to "establish the fact that [was] essential to [his] claim—that he wished to testify on his own behalf and was prevented from doing so." *Thompson*, 2019 WL 1065925, at *6. Although the defendant had told the trial court that he wanted to testify, there was "a follow-up discussion that reflect[ed] that [he] and his counsel were still discussing the issue," and "after that, the record [wa]s silent." *Id.* Such silence "ma[d]e[] it impossible to resolve [his Sixth Amendment] claim on direct appeal, no matter the standard." *Id.* It undermined the defendant's ability to establish that his expressed desire to testify had been frustrated—as was required to show error under *McCoy*—and it undermined his ability to establish his counsel's deficient performance—as was

21

required to show error under *Strickland.* *See id.* (further noting that "[t]he failure to call a defendant or any witness to testify during a punishment trial is not on its face so outrageous that it represents deficient performance" on a silent record).

The same is true here. Whether we review Stephenson's complaint under *McCoy* or *Strickland*, Stephenson cannot prevail without a record that supports the crux of his claim: that his counsel deficiently disregarded his expressed desire to exercise his right to testify.[25] As Stephenson candidly acknowledges, the record is silent on this issue. Faced with such a silent record, we cannot infer error. *Turner*, 570 S.W.3d at 276 ("[A] defendant cannot simply remain silent before and during trial and raise a *McCoy* complaint for the first time after trial."); *Thompson*, 2019 WL 1065925, at *4 (noting that we "may not infer ineffective assistance simply from an unclear record or a record that does not show why counsel failed to do something").

Because the silent record is insufficient to establish a deprivation of Stephenson's Sixth Amendment right to testify—whether such deprivation is analyzed under *McCoy* or *Strickland*—we overrule this issue.

---

[25]The appellant in *Thompson* also alleged that his trial counsel had talked him out of testifying. *See* 2019 WL 1065925, at *6. Stephenson makes no such claim.

## B. Sufficiency Challenge

Stephenson next challenges the sufficiency of the evidence to support his conviction for indecency with a child by contact.[26] He argues that there was insufficient evidence for the jury to conclude that he acted with sexual intent, i.e., that when he touched Simon, he acted with the intent to arouse or gratify his sexual desire. *See* Tex. Penal Code Ann. § 21.11(a)(1), (c)(1).

When reviewing the sufficiency of the evidence to support an essential element of a crime, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the challenged essential element beyond a reasonable doubt. *Edward v. State*, 635 S.W.3d 649, 655–56 (Tex. Crim. App. 2021); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). The crime at issue here is indecency with a child by contact, which a person commits by "engag[ing] in sexual contact with the child or caus[ing] the child to engage in sexual contact." Tex. Penal Code Ann. § 21.11(a)(1). "Sexual contact" is defined to include a list of acts when those acts are "committed with the intent to arouse or gratify the sexual desire of any person"—the element at issue here. *Id.* § 21.11(c); *see McKenzie v. State*, 617 S.W.2d 211, 213 (Tex. Crim. App. 1981) ("An essential element of the offense of

---

[26]Stephenson raises his sufficiency challenge as his first issue in cause number 02-22-00102-CR (his indecency conviction). He raised a similar argument through a motion for directed verdict after the State rested its case.

indecency with a child is . . . the specific intent to arouse or gratify the sexual desire of any person.").

"[T]he requisite specific intent to arouse or gratify the sexual desire of any person can be inferred from the defendant's conduct, his remarks[,] and all surrounding circumstances." *McKenzie*, 617 S.W.2d at 216; *see Weaver v. State*, No. 02-21-00081-CR, 2022 WL 2978730, at *8 (Tex. App.—Fort Worth July 28, 2022, pet. ref'd) (mem. op., not designated for publication). Such circumstantial evidence is just as probative as direct evidence, and the jury may draw reasonable inferences from the circumstantial evidence. *See Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013) (distinguishing between inferences and speculation); *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007) (describing an inference as "a conclusion reached by considering other facts and deducing a logical consequence from them" and describing speculation as "mere theorizing or guessing about the possible meaning of facts"). The defendant need not vocalize or admit his sexual intent for the jury to infer that such intent was present. *See Weaver*, 2022 WL 2978730, at *8.

Stephenson appears to claim that the jury could not infer sexual intent because Simon described Stephenson as laughing or joking when he grabbed Simon's penis. But what the evidence actually showed was that Stephenson told Simon he was joking. Simon testified that he did not believe it was a joke, and the jury was not required to believe that it was either. *See Edward*, 635 S.W.3d at 655 (reciting rule that "a juror may choose to believe or disbelieve all, some, or none of the evidence presented"); *Queeman*,

24

520 S.W.3d at 622 ("The jury is the sole judge of the credibility of witnesses and the weight to be given to their testimonies.").

There was sufficient circumstantial evidence from which the jury could have logically inferred that, rather than joking, Stephenson was acting with sexual intent. The indecent conduct alone—Stephenson's repeatedly grabbing Simon's genitals—was indicative of such intent. *See Weaver*, 2022 WL 2978730, at *9 (holding defendant's "conduct alone [wa]s sufficient to infer intent" when defendant repeatedly touched child's breasts but claimed he was massaging her); *Corporon v. State*, 586 S.W.3d 550, 562 (Tex. App.—Austin 2019, no pet.) (holding that jury could have inferred sexual intent from the manner in which the defendant touched child's genitals).

And Stephenson implicitly recognized the sexual overtone of his conduct when, after grabbing Simon, he told him "that he [wa]sn't gay and that he only like[d] women." *See Weaver*, 2022 WL 2978730, at *8 (noting that "intent can be inferred from the appellant's conduct after the incident" (quoting *Williams v. State*, 305 S.W.3d 886, 891 (Tex. App.—Texarkana 2010, no pet.))). Such a disclaimer reflected Stephenson's awareness that grabbing Simon's penis was a sexual act that could be understood to reflect a same-sex attraction.

Such awareness was further reflected by Stephenson's comment that if Brittney found out what he had done, she would look at him differently. There was no reason to believe that Brittney would look at her husband differently if, as Stephenson insisted, he was merely joking. But there was certainly a reason to believe that she would look

at her husband differently if he had been acting with the intent to arouse or gratify his sexual desire through his conduct with her son. Thus, the instruction by Stephenson not to tell Brittney because she would look at him differently provided circumstantial evidence that Stephenson acknowledged sexual intent with regard to his conduct.

Stephenson's other statements during and after the grabbing incidents also supported the jury's conclusion that his conduct was not intended as a joke. Simon testified that when Stephenson grabbed his penis he asked, "Do you like that?" This question placed the grabbing incidents within Stephenson's larger pattern of sexual abuse; Courtney, Rebecca, and Tina testified that Stephenson similarly inquired whether they liked his sexual conduct when he inappropriately touched them. *Cf. Corporon*, 586 S.W.3d at 562 (holding evidence sufficient to infer sexual intent and noting that, when defendant indecently touched child, he asked her how it felt); *Tyler v. State*, 950 S.W.2d 787, 789 (Tex. App.—Fort Worth 1997, no pet.) (holding evidence of sexual intent sufficient when defendant touched both victim and second child under similar circumstances). And there is no evidence that his sexual abuse of the girls was done as a joke.

Plus, after grabbing Simon, Stephenson warned him that if he told anyone, CPS would get involved and tear the family apart. This, too, indicates that Stephenson viewed his conduct as more than a simple joke. And, again, this warning fit Stephenson's pattern of making similar threats to at least two of Simon's victimized sisters after he sexually abused them.

26

But even more telling than the content of the threats was the fact that Stephenson made them. Stephenson's insistence on secrecy is inconsistent with his claim that he was joking; insistence on secret-keeping "shows a consciousness of guilt which leads to an inference that . . . [he] had the specific intent to arouse and gratify his own sexual desire." *Bousquet v. State*, No. 01-02-01209-CR, 2003 WL 22254683, at \*2 (Tex. App.—Houston [1st Dist.] Oct. 2, 2003, pet. ref'd) (mem. op., not designated for publication) (holding evidence sufficient to show sexual intent when defendant threatened "that he would hurt complainant and his mother if complainant ever told"); *see Johnson v. State*, No. 02-13-00482-CR, 2015 WL 1792971, at \*3 (Tex. App.—Fort Worth Apr. 16, 2015, pet. ref'd) (mem. op., not designated for publication) (holding evidence sufficient to show sexual intent and noting that the defendant "was trying to hide his actions"); *Dease v. State*, No. 01-02-00096-CR, 2003 WL 124817, at \*3 (Tex. App.—Houston [1st Dist.] Jan. 16, 2003, pet. ref'd) (mem. op., not designated for publication) (holding jury could have inferred sexual intent when, after defendant touched victim, "he told her not to tell anyone about it"); *Branson v. State*, 825 S.W.2d 162, 168 (Tex. App.—Dallas 1992, no pet.) (holding evidence of sexual intent sufficient and stating rule that "[e]vidence that the accused told the victim not to tell or that he would hurt her will support an inference that the accused knew what he was doing was wrong and punishable").

Based on Stephenson's repeatedly grabbing Simon's genitals, his inquiry during one of the grabbing incidents, his threats and statements after the incidents, and

Simon's testimony that he did not see Stephenson's behavior as a joke, there was sufficient evidence for the jury to infer that Stephenson acted "with the intent to arouse or gratify [his] sexual desire." Tex. Penal Code Ann. § 21.11(c). We overrule this issue.

## C.    Evidentiary Challenge

Next, Stephenson asserts that the trial court erred by applying Rule 412 to exclude Investigator Haiduk's testimony about Simon's alleged sexual relationships with Rebecca and Tina.[27] Rule 412 applies to prosecutions for certain sexual offenses and renders inadmissible "reputation or opinion evidence of a victim's past sexual behavior" and "specific instances of a victim's past sexual behavior." Tex. R. Evid. 412(a). There are exceptions,[28] though, and Stephenson claims that Investigator Haiduk's testimony was admissible under two of those exceptions:  as evidence of "the victim's motive or bias," and as evidence "constitutionally required to be admitted" by the Due Process[29]

---

[27]Stephenson raises his evidentiary challenge as his second issue in cause number 02-22-00102-CR (his indecency conviction), and as his first issue in cause number 02-22-00104-CR (his conviction for continuous sexual abuse of Rebecca and Tina).

[28]The Rule 412 exceptions apply to "[e]vidence of specific instances of a victim's past sexual behavior"—not "reputation or opinion evidence of a victim's past sexual behavior." Tex. R. Evid. 412(a), (b). When the State objected to the relevant portion of Detective Haiduk's testimony at trial, it objected under Rule 412 generally without specifying whether the testimony was "reputation or opinion evidence" or "specific instances of a victim's past sexual behavior." Neither party discusses the distinction on appeal.

[29]Specifically, Stephenson asserts that Rule 412 "does not extend so far" as to invade his constitutional right to present a complete defense and that (1) the alleged sexual relationship with Simon was "a possible motivation [for Rebecca and Tina] to fabricate [their] outcr[ies]"; and (2) Simon was an alternate suspect for Rebecca's and

and Confrontation Clauses. *See* Tex. R. Evid. 412(b)(2)(C), (E). But as the State points out, these alleged grounds for admission were not raised below.

If a proponent of evidence wishes to complain on appeal regarding the exclusion of that evidence, "it is not enough to [have] t[old] the judge that [the] evidence [wa]s admissible"; the proponent "must have told the judge why the evidence was admissible." *Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005); *see* Tex. R. App. P. 33.1(a)(1)(A). If the proponent did not tell the trial court why the evidence was admissible, or if the ground for admission that he gave the trial court does not comport with his argument on appeal, then "he has preserved nothing for review." *Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999); *see Reyna*, 168 S.W.3d at 177–80; *McDonald v. State*, No. 02-13-00483-CR, 2015 WL 2353307, at *3 (Tex. App.—Fort Worth May 14, 2015, no pet.) (mem. op., not designated for publication).

Stephenson told the trial court that Investigator Haiduk's testimony regarding the victims' alleged sexual relationships was admissible to prove Rebecca's and Simon's "credibility" because Rebecca's descriptions of Stephenson's sexual abuse had changed over time. Stephenson did not mention either of the Rule 412 exceptions he raises on

---

Tina's sexual abuse. *See Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S. Ct. 1727, 1731 (2006) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (quoting *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 2146 (1986))).

appeal—he did not mention anything about the victims' motive or bias, nor did he mention anything about the evidence being constitutionally required. *Cf. Reyna*, 168 S.W.3d at 175–79 (holding that defendant did not preserve Confrontation Clause challenge to exclusion of evidence by telling the trial court that evidence went to a "[c]redibility issue" without "[']clearly articulat[ing]' that the Confrontation Clause demanded admission of the evidence" (quoting *Clark v. State*, 881 S.W.2d 682, 694 (Tex. Crim. App. 1994))). He thus failed to preserve his complaint for appeal. *See* Tex. R. App. P. 33.1(a); *Barker v. State*, No. 01-19-01009-CR, 2021 WL 4733789, at *5 (Tex. App.—Houston [1st Dist.] Oct. 12, 2021, pet. ref'd) (mem. op., not designated for publication) (holding defendant forfeited complaint that evidence excluded under Rule 412 was "constitutionally required" under Rule 412(b)(2)(E) when he argued at trial that it was admissible to prove "motive or bias" under Rule 412(b)(2)(C)); *McDonald*, 2015 WL 2353307, at *3 (holding defendant failed to preserve complaint that evidence excluded under Rule 412 was "scientific or medical evidence" under Rule 412(b)(2)(A) when he argued at trial that evidence went to motive or bias under Rule 412(b)(2)(C)).

We overrule this issue.[30]

---

[30]Even if Stephenson had preserved his Rule 412 complaint, we would still affirm the trial court's ruling because he has not addressed the State's hearsay objection, which was an alternative basis for the ruling. *See Petty v. State*, No. 02-21-00130-CR, 2022 WL 4545532, at *5 (Tex. App.—Fort Worth Sept. 29, 2022, pet. ref'd) (mem. op., not designated for publication) ("When an appellant fails to challenge all independent grounds supporting the trial court's ruling on appeal, we must affirm the trial court's ruling on the unchallenged ground.").

## D. Double Jeopardy Challenges

Finally, Stephenson raises two Double Jeopardy challenges arguing that he was—or hypothetically could have been—punished twice for the same conduct.

The Fifth Amendment's Double Jeopardy Clause provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.  This guarantees several protections, including protection from receiving multiple punishments for the same offense.  *Nawaz v. State*, 663 S.W.3d 739, 743 (Tex. Crim. App. 2022); *Rachal v. State*, Nos. 02-18-00500-CR, 02-18-00501-CR, 2019 WL 5996985, at *5 (Tex. App.—Fort Worth Nov. 14, 2019, pet. ref'd) (mem. op., not designated for publication).  In the multiple-punishments context, two offenses may be the same if one is a lesser-included offense of the other or if the two offenses are defined under distinct statutory provisions but the legislature made it clear that only one punishment was intended.  *Littrell v. State*, 271 S.W.3d 273, 275–76 (Tex. Crim. App. 2008) (noting further that "[s]ameness in this context is a matter of legislative intent").

When, as here,[31] a defendant fails to preserve his Double Jeopardy challenges, he may raise them for the first time on appeal if enforcing the usual rules of procedural

---

[31]Stephenson notes that he raised Double Jeopardy challenges in his motions for new trial, but the State argues that he was required to raise these challenges at or before trial to preserve them.  *See Gonzalez v. State*, 8 S.W.3d 640, 642 (Tex. Crim. App. 2000) (holding that, generally, a defendant has "the burden to preserve, in some fashion, a

default would serve no legitimate state interest and the undisputed facts show that the violation is clearly apparent on the face of the record.[32] *Langs v. State*, 183 S.W.3d 680, 687 (Tex. Crim. App. 2006); *Gonzalez*, 8 S.W.3d at 642–43; *Tufts*, 2020 WL 5242431, at *25.

Stephenson argues that the face of the record shows two Double Jeopardy violations: (1) that the flexible "on or about" dates in his indictments and jury charge allowed the jury to punish him for both sexually assaulting and continuously sexually abusing Courtney based on the same incidents of abuse; and (2) that his two counts of continuous sexual abuse punished him twice for the same pattern of abuse and were required to be combined into a single charge.

The first challenge is resolved by established case law, but the second is an issue of first impression.

---

[D]ouble [J]eopardy objection at or before the time the charge [was] submitted to the jury" (internal quotation marks omitted)).

Either way, Stephenson's motions for new trial did not preserve the challenges he raises on appeal. Although he filed new-trial motions in four of his six cases, and although those motions raised Double Jeopardy challenges, they did not raise the same challenges that he presents on appeal.

[32]A Double Jeopardy claim is apparent on the face of the trial record "if resolution of the claim does not require further proceedings for the purpose of introducing additional evidence in support of the . . . claim." *Ex Parte Denton*, 399 S.W.3d 540, 544 (Tex. Crim. App. 2013); *see Tufts v. State*, No. 02-19-00143-CR, 2020 WL 5242431, at *25 (Tex. App.—Fort Worth Sept. 3, 2020, pet. ref'd) (mem. op., not designated for publication).

### 1. Potential Overlap of Continuous Sexual Abuse and Sexual Assaults

Stephenson argues that because he was convicted of not only sexually assaulting Courtney in 2017 and 2018 but also continuously sexually abusing her between 2014 and 2016,[33] and because the State was not bound to the "on or about" dates alleged in the indictments and recited in the charges,[34] the jury could have strayed from the dates alleged for his 2017 and 2018 sexual assaults and duplicatively punished him for predicate acts that occurred between 2014 and 2016, i.e., during the period of his continuous sexual abuse.[35]

But as the State points out, this possibility was entirely hypothetical.[36] The evidence at trial showed that the offenses did not overlap, and that is what matters. *See Allen v. State*, 620 S.W.3d 915, 919–22 (Tex. Crim. App. 2021).

---

[33]The time period for which Stephenson was convicted of continuously sexually abusing Courtney ended the day before her 14th birthday.

[34]Stephenson notes that jury charge informed the jury that the State was not bound to the "on or about" dates alleged in the indictments, and some portions of his brief appear to frame this Double Jeopardy issue as a matter of charge error. Either way, the gist of his argument is the same: he does not claim that the charge misstated the law but rather that the law itself—the rule that the State was not bound to the dates alleged in the indictments and recited in the jury charges—resulted in Double Jeopardy violations.

[35]Stephenson raises this as his third, fourth, and fifth issues—one for each of the counts of sexual assault—in cause numbers 02-22-00101-CR, 02-22-00103-CR, 02-22-00105-CR, and 02-22-00106-CR.

[36]Stephenson, too, indirectly acknowledges that the dates of his alleged offenses do not in fact overlap.

It is well established that "trial upon an indictment does not bar every offense that could be prosecuted under its language; instead, trial upon the indictment bars prosecution [and punishment] only for offenses for which proof was offered at trial." *Ex parte Goodbread*, 967 S.W.2d 859, 861 (Tex. Crim. App. 1998) (reciting rule when appellant challenged prosecution after mid-trial dismissal and noting further that, even if proof of an offense is offered at trial, "the State or the trial court can exclude an instance of conduct from the jeopardy bar through an election"). The Court of Criminal Appeals recently reiterated as much in the continuous sexual abuse context. *See Allen*, 620 S.W.3d at 919–22.

In *Allen v. State*, the defendant was indicted for numerous offenses including indecency with a child in September 2009 and continuous sexual abuse of the same child between October 2009 and August 2012. *Id.* at 917, 919, 921–22. But at trial, the State offered evidence that the indecency offense had occurred in December 2011. *Id.* at 919, 922 & n.10. On appeal, the defendant argued that his indecency conviction could not stand because the 2011 indecency offense was within the time period alleged in his indictment for his continuous sexual abuse of the same victim. *Id.* at 919.

The Court of Criminal Appeals noted that the continuous sexual abuse statute prohibits a defendant's additional conviction for a predicate offense only if that offense "occurred [in]side the period in which the [continuous sexual abuse offense] was committed." *Id.*; *see* Tex. Penal Code Ann. § 21.02(e)(2). The statutory prohibition turns on what dates the evidence shows the offenses actually "occurred" or were

34

"committed" rather than what dates are "alleged." Tex. Penal Code Ann. § 21.02(e); *see Allen*, 620 S.W.3d at 919–20. The court thus held that "in determining whether a defendant may be convicted for a continuous abuse offense and an offense listed [as a predicate offense] in § 21.02(c) in the same criminal action and against the same victim, the proper consideration is whether the evidence shows that the [predicate] offense occurred outside of the period that the continuous abuse offense was committed"; the determination "does not consider whether the [predicate] offense occurred outside the time period alleged in the indictment for the continuous abuse offense."[37] *Allen*, 620 S.W.3d at 921.

Although the issue in *Allen* was not identical to the one Stephenson raises here, *Allen*'s holding undermines the core of Stephenson's position: his reliance on the indictments' flexible "on or about" dates rather than on the evidence. He is correct that the "on or about" dates alleged in the indictments were not binding on the State, *see id.* at 920, but the question is not what flexibility the indictments allowed but on what dates the evidence showed the offenses "occurred" or "w[ere] committed." Tex. Penal Code Ann. § 21.02(e)(2).

---

[37]The *Allen* court ultimately held that the evidence showed continuous sexual abuse from "the middle of the 2008–2009 school year through December 2011," and because the parties agreed that the evidence showed the indecency offense had been committed in December 2011, it was within the time period of the continuous sexual abuse offense and was barred by Double Jeopardy. *Allen*, 620 S.W.3d at 921–22 & n.10.

The evidence showed—and the judgments reflect—that Stephenson continuously sexually abused Courtney from approximately March 2014 to March 2016 and that he sexually assaulted her in March 2017, June 2018, and October 2018. The latter three offenses were not only committed outside the time period of the continuous sexual abuse offense, but because Courtney was over the age of 14 when the sexual assaults occurred, they could not have been included as predicate acts for the continuous sexual abuse charge even if the State had wanted to include them. *See id.* § 21.02(b)(2)(A).

Because "the proper consideration is whether the evidence shows that the [predicate] offense occurred outside of the period that the continuous abuse offense was committed," *Allen*, 620 S.W.3d at 921, and because the evidence showed that Stephenson's sexual assaults of Courtney occurred outside the period of his continuous sexual abuse of her, no violation of Stephenson's Double Jeopardy rights is apparent on the face of the record. *See Langs*, 183 S.W.3d at 687. We overrule this issue.

### 2. Multiple Counts of Continuous Sexual Abuse

Stephenson's second Double Jeopardy issue is not quite as simple. He argues that his two counts of continuous sexual abuse should have been combined into a single count because even though they involved different victims, they reflected a single unit

36

of prosecution.[38] He claims that the gravamen of continuous sexual abuse is the nature of the conduct—the pattern of sexual abuse—and because the Penal Code authorizes a single count of continuous sexual abuse to encompass multiple victims, the separate victims were not separate units of prosecution. He thus reasons that his two convictions for continuous sexual abuse were part of the same unit of prosecution— the same pattern of abuse—and the trial court punished him twice for the same offense.

The Court of Criminal Appeals has yet to weigh in on the allowable unit of prosecution for continuous sexual abuse, and the question is an issue of first impression for this court. *See Cisneros v. State*, 622 S.W.3d 511, 520 (Tex. App.—Corpus Christi– Edinburg 2021, no pet.) (op. on remand) (noting lack of authority on the issue).

### a.    Governing Law

The Legislature has the authority to define crimes, including the allowable unit of prosecution, i.e., what constitutes a distinct, discrete violation of the statute. *Harris v. State*, 359 S.W.3d 625, 629 (Tex. Crim. App. 2011). Consequently, determining whether the Double Jeopardy Clause prohibits multiple punishments under the same statute requires an examination of what "the state legislature prescribed with respect to how many times an offender may be punished[.]"[39]  *Nawaz*, 663 S.W.3d at 743.

---

[38]Stephenson raises this as his second issue in cause number 02-22-00104-CR (his conviction for continuous sexual abuse of Rebecca and Tina).

[39]Although Double Jeopardy challenges are often analyzed under the test established in *Blockburger v. United States*, 284 U.S. 299, 300–05, 52 S. Ct. 180, 180–82 (1932), that test does not apply when the defendant is challenging two prosecutions

Generally, absent an express statutory statement dictating that "the allowable unit of prosecution shall be such-and-such," the best indicator of the allowable unit of prosecution is the gravamen or focus of the offense. *Harris*, 359 S.W.3d at 630; *Jones v. State*, 323 S.W.3d 885, 889 (Tex. Crim. App. 2010). "Although this inquiry resolves the [D]ouble [J]eopardy analysis, it is purely one of statutory construction." *Jones*, 323 S.W.3d at 888; *see Harris*, 359 S.W.3d at 629.

In construing a statute, we "seek to effectuate the 'collective' intent or purpose of the legislators who enacted the legislation." *Price v. State*, 434 S.W.3d 601, 605 (Tex. Crim. App. 2014) (first quoting *Reynolds v. State*, 423 S.W.3d 377, 382 (Tex. Crim. App. 2014); and then quoting *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991)). The definitive evidence of that collective intent—"the only thing actually adopted by the legislators . . . and submitted to the Governor for [his] signature"—is the "literal text." *Boykin*, 818 S.W.2d at 785. We "attempt to discern the fair, objective meaning of that text at the time of its enactment" using established canons of construction, reading words and phrases in context, and construing the text according to the rules of grammar and common usage. *Lang v. State*, 561 S.W.3d 174, 180 (Tex. Crim. App. 2018) (quoting *Boykin*, 818 S.W.2d at 785).

---

brought under the same statute, as Stephenson is here. *See Ex parte Goodman*, 152 S.W.3d 67, 70 n.5 (Tex. Crim. App. 2004).

When the plain language of the statute is clear and unambiguous, "the Legislature must be understood to mean what it has expressed, and it is not for the courts to add or subtract from such a statute." *Boykin*, 818 S.W.2d at 785 (quoting *Coit v. State*, 808 S.W.2d 473, 475 (Tex. Crim. App. 1991)); *see Price*, 434 S.W.3d at 605 (noting that, when statutory language is unambiguous, we give effect to its plain meaning absent absurd consequences).

### b.     Plain Language

We therefore begin with the plain language of the continuous sexual abuse statute.

That statute—Article 21.02 of the Penal Code—penalizes a person if, "during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims," as long as when each act is committed, "the victim is . . . a child younger than 14 years of age." [40]  Tex. Penal Code Ann. § 21.02(b).  The jury need not "agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed" as long as it "agree[s] unanimously that the defendant, during a period that is 30 or more days in duration,

---

[40]As an alternative to proving that the victim of continuous sexual abuse is under the age of 14, the State can establish that the victim is a disabled individual.  Tex. Penal Code Ann. § 21.02(b)(2).  But there was neither allegation nor evidence that Courtney was disabled.

committed two or more acts of sexual abuse." *Id.* § 21.02(d). Clearly, given that the legislature did not prioritize unanimity on the specific predicate acts, "[t]he gravamen of a Section 21.02 [continuous sexual abuse] offense is not a particular instance of one of the [predicate] offenses listed in Section 21.02(c)." *Ramos v. State*, 636 S.W.3d 646, 655–57 (Tex. Crim. App. 2021) (distinguishing the societal interest that makes conduct punishable as continuous sexual abuse from that which makes it punishable as prohibited sexual conduct).

But in contrast to the legislature's de-emphasizing the specific predicate acts— and to prevent problems that might arise because of it—the legislature expressly identified other parameters of the offense that bar dual convictions. *See Soliz v. State*, 353 S.W.3d 850, 852 (Tex. Crim. App. 2011) (noting that the prohibitions in "Subsections (e) and (f) appear to be designed to prevent problems that might arise from the legislature's relaxation of the unanimity requirement"). And those parameters are victim-specific.

The first relates to duplicative punishments for predicate offenses. The continuous sexual abuse statute prohibits duplicative convictions for predicate offenses committed within the time period of the continuous sexual abuse, but only if those predicate offenses are committed against "the same victim":

> A defendant may not be convicted in the same criminal action of [a predicate offense] the victim of which is the same victim as a victim of the offense alleged under Subsection (b) [i.e., continuous sexual abuse] unless the [predicate offense] . . . occurred outside the period in which the

40

offense alleged [for continuous sexual abuse] under Subsection (b) was committed.[41]

Tex. Penal Code Ann. § 21.02(e)(2). The focus of this prohibition is not on the defendant's overarching, victim-indifferent pattern of abusing children but on the defendant's pattern of abusing a specific child or specific children. *See id.*

Even more telling are the parameters of the statutory prohibition on partitioning continuous sexual abuse offenses into multiple counts. *See id.* § 21.02(f). The legislature prohibited the State from charging a defendant "with more than one count [of continuous sexual abuse] if all of the specific acts of sexual abuse that are alleged to have been committed are alleged to have been committed against a single victim." *Id.* In other words, if all of the pleaded predicate acts were "committed against a single victim," then those acts form a single allowable unit of prosecution. *See id.* This stops short of expressly stating that "the allowable unit of prosecution shall be such-and-such," *see Harris,* 359 S.W.3d at 630, but just barely. It is "a strong indication" that the legislature intended the allowable unit of prosecution to be victim-specific. *See Ellison v. State*, 425 S.W.3d 637, 645–46 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (holding similarly in construction of continuous family violence statute).

---

[41]If the predicate offense occurred within the relevant time period, it may be charged in the alternative or considered by the trier of fact as a lesser-included offense. *Id.* § 21.02(e)(1), (3).

41

Meanwhile, Stephenson's proposed interpretation of the continuous sexual abuse statute would render the statutory anti-partitioning provision meaningless. If, as he proposes, we were to construe the statute to prohibit more than one count per overarching, victim-indifferent pattern of abusing children, then we would nullify the last half of the anti-partitioning provision—the portion that confines the prohibition to instances in which "all of the specific acts of sexual abuse that are alleged to have been committed are alleged to have been committed against a single victim." Tex. Penal Code Ann. § 21.02(f). An interpretation that renders portions of a statute ineffectual is contrary to the canons of construction as well as common sense. Both dictate the "presum[ption] that every word in a statute has been used for a purpose" and both require us to give effect to "each word, phrase, clause, and sentence . . . if reasonably possible.'" *Lang*, 561 S.W.3d at 180 (quoting *State v. Hardy*, 963 S.W.2d 516, 520 (Tex. Crim. App. 1997)); *see Allen*, 620 S.W.3d at 919–20 (similar).

If the legislature had intended Stephenson's proposed meaning—if it had "intended to prohibit multiple [continuous sexual abuse] prosecutions in cases with multiple victims, or if it [had] intended to prohibit multiple [continuous sexual abuse] prosecutions relating to the same time period irrespective of the number of victims[—]it could have easily done so, but it did not." *Cisneros*, 622 S.W.3d at 520–21. Rather, the statutory text unambiguously demonstrates the legislature's intent for the unit of prosecution to turn on whether the "two or more acts of sexual abuse" (committed over a period of 30 days or more) were "committed . . . against a single victim."[42] Tex. Penal Code Ann. § 21.02(b), (f).

---

[42]The Court of Criminal Appeals has noted that the continuous sexual abuse statute was enacted as a "legislative response to Judge Cochran's concurring opinion in *Dixon v. State*, 201 S.W.3d 731, 737 (Tex. Crim. App. 2006) (Cochran, J., concurring)," in which she called for a new Penal Code provision that focused on "the existence of a sexually abusive relationship with a young child . . . marked by continuous and numerous acts of sexual abuse of the same or different varieties." *Ramos*, 636 S.W.3d at 655 (quoting *Price*, 434 S.W.3d at 607–08). Our interpretation of the statutory text is consistent with this legislative history; both reflect a legislative focus on the defendant's "sexually abusive relationship" with a specific victim. *See Dixon*, 201 S.W.3d at 737 (Cochran, J., concurring).

Nonetheless, because the statute is unambiguous on the question before us, the legislative history does not sway our textual analysis. *See Boykin*, 818 S.W.2d at 785–86 (recognizing that "[i]f the plain language of a statute would lead to absurd results, or if the language is not plain but rather ambiguous, then *and only then*, out of absolute necessity, is it constitutionally permissible for a court to consider . . . *extra*textual factors"); *cf. Price*, 434 S.W.3d at 605–07 ("resort[ing]" to extratextual factors after finding statute ambiguous on question at issue).

### c.    Guidance from Case Law

Our sister court has interpreted the continuous sexual abuse statute similarly. When faced with the same issue of first impression that confronts us here, the Thirteenth Court of Appeals identified the allowable unit of prosecution for continuous sexual abuse based, in large part, on the text of the anti-partitioning provision. *See Cisneros*, 622 S.W.3d at 520–21.

In *Cisneros*, the defendant (Cisneros) was convicted of two counts of continuous sexual abuse, one for each of his two stepdaughters.[43] *Id.* at 515–16, 520. On appeal, he raised a Double Jeopardy challenge similar to the one Stephenson raises here. Because the Penal Code's definition of continuous sexual abuse encompasses multiple predicate acts "regardless of whether the acts of sexual abuse are committed against one or more victims," *see* Tex. Penal Code Ann. § 21.02(b)(1), Cisneros claimed that he had been convicted of the same offense—committing sexual acts against "one or more victims"—twice. *Cisneros*, 622 S.W.3d at 520. The Thirteenth Court of Appeals rejected this argument.

Focusing on the language of the continuous sexual abuse statute, the court observed that the anti-partitioning provision prohibited "more than one count [only] if all of the specific acts of sexual abuse . . . are alleged to have been committed against a

---

[43]The defendant was convicted of other sexual offenses as well, all of which were committed against his stepdaughters. *Cisneros*, 622 S.W.3d at 515–16.

single victim," and it reasoned that the corollary to this "is that a defendant *may* be charged with more than one count of continuous sexual abuse if multiple acts of sexual abuse are alleged to have been committed against each of multiple victims." *Id.* (agreeing with the State's argument).

The *Cisneros* court also noted that the Court of Criminal Appeals had indirectly commented on the unit of prosecution in *Price v. State. See id.* at 520–21. *See generally Price*, 434 S.W.3d at 605–11. There, the Court of Criminal Appeals addressed "whether the statute defining the offense of continuous sexual abuse of a young child permits a defendant to be convicted both of that offense and of a criminal attempt to commit a predicate offense under that statute." *Price*, 434 S.W.3d at 603. Ultimately, it held that allowing such dual convictions would defeat the legislative intent and violate a defendant's rights under the Double Jeopardy Clause. *Id.* at 609–11. A key stepping stone to that holding, though, was the court's analysis of the legislative intent behind the continuous sexual abuse statute.[44] *See id.* at 605–11; *see also Nawaz*, 663 S.W.3d at 746 (noting that, in determining unit of prosecution, "the Court will look to see what it has said when construing that statute for *other* purposes" because "'[w]hether statutory construction occurs in the [D]ouble [J]eopardy context,' or in some other context . . . ,

_____

[44]Because the court concluded that the statutory language was ambiguous regarding whether a defendant could be convicted of both continuous sexual abuse and attempt to commit a predicate offense, the court examined extratextual indicators of legislative intent. *Price*, 434 S.W.3d at 606–11.

45

'the issue is the same: the meaning of the statute'" (quoting *Jones*, 323 S.W.3d at 889)). On that question, the Court of Criminal Appeals repeatedly concluded that "the Legislature intended to permit one conviction for continuous sexual abuse for conduct committed against a single complainant during a specified time period." *Price*, 434 S.W.3d at 609; *see id.* at 605–06, 611 (similar).

The *Cisneros* court emphasized *Price*'s summary of the legislative intent, and it ultimately held—consistent with both *Price* and the anti-partitioning provision—that the unit of prosecution for continuous sexual abuse was "a series of acts of sexual abuse 'that occur over an extended period of time against a single complainant.'" *Cisneros*, 622 S.W.3d at 521 (quoting *Price*, 434 S.W.3d at 605–06).

### d. Interpretation of Similar Statutes

This construction of the allowable unit of prosecution also aligns with Texas courts' interpretations of similarly worded Penal Code provisions.

The structure of the continuous sexual abuse statute is similar to that of the statute criminalizing continuous family violence. *Compare* Tex. Penal Code Ann. § 21.02, *with id.* § 25.11; *see also Ellison*, 425 S.W.3d at 646 (noting similarly). Both statutes criminalize "two or more" predicate offenses within a specified time period; both authorize the inclusion of multiple victims (or, for continuous family violence, multiple households) in a single count; both prohibit a defendant from being separately convicted for a predicate offense; and both prohibit the State from partitioning the defendant's charge into more than one count if all of the alleged predicate acts involve

46

a single victim (or, for continuous family violence, single household). *Compare* Tex. Penal Code Ann. § 21.02 (criminalizing continuous sexual abuse), *with id.* § 25.11 (criminalizing continuous family violence). Just as we have noted the significance of the last limitation—the anti-partitioning limitation—in our unit-of-prosecution analysis for continuous sexual abuse, our sister court recognized the anti-partitioning limitation as "a strong indication" of the allowable unit of prosecution for continuous family violence. *Ellison*, 425 S.W.3d at 645–48 (rejecting argument that State could punish defendant twice based on overlapping predicate offenses and holding that allowable unit of prosecution was "a series of at least two bodily-injury assaults committed within a certain 12-months-or-less period against a single victim in a dating relationship with appellant").[45]

The same rationale was employed by another court of appeals to interpret another parallel statute: the statute for repeated violations of certain court orders. *See* Tex. Penal Code Ann. § 25.072; *State v. Maldonado*, 523 S.W.3d 769, 774–77 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.). That statute, too, criminalizes "two or more" predicate offenses within a specified time period, authorizes the inclusion of

---

[45]In *Rachal v. State*, we adopted a related portion of *Ellison*'s unit-of-prosecution reasoning as our own. 2019 WL 5996985, at *6. But there, we focused on the portion of the continuous family violence statute that prohibits separate convictions for predicate offenses, and we held that the defendant's Double Jeopardy rights had been violated because the predicate acts for his continuous family violence conviction had been used to separately convict him of other variations of assault. *Id.*

multiple court orders in a single count, prohibits a defendant from being separately convicted for a predicate offense, and prohibits the State from partitioning the defendant's charge into more than one count if all of the predicate acts are alleged to violate a single court order. *Compare* Tex. Penal Code Ann. § 21.02 (criminalizing continuous sexual abuse), *with id.* § 25.072 (criminalizing repeated violations of court orders), *and id.* § 25.11 (criminalizing continuous family violence). Once again, our sister court focused on the anti-partitioning provision, noting that it was "a strong indication" of the unit of prosecution intended by the legislature. *See Maldonado*, 523 S.W.3d at 774–76 (discussing *Ellison*'s reasoning and holding that allowable unit of prosecution was "two or more [predicate offenses] in a period of twelve months or less which violate the same court order or setting of bond").

### e.    Holding

The plain language of the continuous sexual abuse statute, the persuasive case law interpreting it, and the interpretations of similarly worded statutes all support the same conclusion:  the legislature intended "to permit one conviction for continuous sexual abuse based on the repeated acts of sexual abuse that occur over an extended period of time [30 or more days in duration] against a single complainant." *Cisneros*, 622 S.W.3d at 520 (emphasis removed) (quoting *Price*, 434 S.W.3d at 605–06); *see* Tex. Penal Code Ann. § 21.02(b), (f). It is undisputed that Stephenson's two continuous sexual abuse convictions involved different victims and occurred over different periods of time. Therefore, his convictions do not violate the Double Jeopardy Clause.

48

We overrule this issue.

## III. Conclusion

Having overruled all of Stephenson's issues, we affirm the trial court's six judgments of conviction.  Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Publish
Tex. R. App. P. 47.2(b), 47.4(a)

Delivered:  July 20, 2023